2000 ME 172

**STATE of Maine**

v.

**Steven D. HOLLOWAY.**

Supreme Judicial Court of Maine.

Argued May 3, 2000.
Decided Oct. 11, 2000.
As Modified Nov. 7, 2000.

*Smith,* 457 A.2d 816, 819–20 & n. 7 (Me.    1983).

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Lisa P. Marchese, Asst. Attorney General, Augusta, for State.

David M. Sanders (orally), Livermore Falls, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

DANA, J.

[¶ 1] Steven D. Holloway appeals from a judgment of conviction entered by the Superior Court (Franklin County, *Studstrup, J.*) on his conditional guilty plea to murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983).[1] Holloway entered his conditional plea pursuant to M.R. Civ. P. 11(a)(2) following the court's denial of his motion to suppress his statements to the police on January 15, 1998, thereby preserving the issue for appeal. Holloway here argues that the court erred when it determined that (1) the January 15, 1998 interrogation of him by the police was not custodial for purposes of *Miranda* until he was formally arrested, (2) his Fifth Amendment privilege against self-incrimination was not violated by his continued interrogation despite an expressed desire not to continue talking to police and to speak with an attorney, (3) the *Miranda* warning given by police and his waiver of those rights following his arrest were effective notwithstanding his previously expressed desire to see an attorney, and (4) his statements to the police were voluntarily given. Because

---

1. Holloway was sentenced to thirty years in prison for the crime.

we agree that the police interrogation of Holloway was ultimately custodial, we vacate his conviction and remand for a determination consistent with this opinion as to when that point was reached.

## I. FACTS

[¶ 2] Although the State and Holloway differ about the details, the significant facts in this case are not disputed. On January 13, 1998, a man was murdered in his home in Wilton. As the result of information from two young girls who lived in the area of the victim's home and information from Holloway's ex-girlfriend, Holloway became a suspect in the murder. The police also learned from Holloway's ex-girlfriend that he was staying at a motel in Farmington. They placed him and his motel room under surveillance on January 14. At the time in question, Holloway did not own an automobile or have a permanent residence.

[¶ 3] On the morning of January 15, Detectives Richard Pickett and Douglas Parlin approached Holloway as he returned to his room from a visit to the motel office, identified themselves, and asked him if they could discuss an incident in Wilton with him. The discussion took place in Holloway's motel room. Holloway sat on his bed with his back against the wall and the two detectives sat facing him in close proximity.[2] The detectives were both carrying weapons in their shoulder holsters, but were also wearing coats and made no open threatening display of the weapons. Holloway testified at the sup-

pression hearing, however, that he could nevertheless see the detectives' weapons.[3] The detectives' questioning began at 9:54 a.m. and the exchange was recorded, the detectives having to take several breaks to turn the tape over or replace it with a new, blank tape.

[¶ 4] Prior to the initiation of the recorded questioning, however, the detectives informed Holloway that the victim, who had been a friend of Holloway's, had been murdered. In the course of the detectives' subsequent recorded questioning, Holloway's story about his activities on the day of the murder changed, with him admitting facts that he had earlier denied. According to Detective Pickett, things got "very confrontational" during the questioning. Holloway testified at the suppression hearing that although he was allowed to get up and walk around several times during the interrogation, Detective Parlin would get up and follow him when he did so.[4]

[¶ 5] At the outset of the recorded questioning, the detectives procured all relevant personal information from Holloway, including his name, most recent address, his date of birth, his place of birth, the names of his parents, his most recent employment, etc. Then, early in the detectives' questioning, Holloway asked who could have murdered the victim, to which Detective Picket replied "Well, that's what we're tryin' tah find out ah, Steve." Shortly thereafter, the detectives informed Holloway that an individual matching his description had been seen in front of the victim's house on the day of the murder

---

**2.** One of the detectives testified, "I was sitting not directly across from Mr. Holloway but a little bit at an angle from him, but in close proximity to him. Detective Parlin was sitting on the foot of the bed.... He [the defendant] sat with his back to the wall and the chair facing out into the room."

**3.** Detective Pickett all but conceded this when he was asked if he displayed his weapon.
   A. I don't believe so. It might have been. It might have been at some point during the—later on when we were talking about—when we were talking about

handguns in the apartment. I might have looked at it and made mention to the fact, was it the same color as this, or was it—I was trying to describe blue, I think, nickel plate, whatever.
   Q. I guess what I am getting at, was it openly displayed in a threat to the individual?
   A. No it was not.

**4.** Detective Parlin testified that when Holloway went outside briefly he watched him from the threshold.

and that was one of the reasons they had sought him out to ask him about the murder. After he denied visiting the victim within the previous several months, the detectives again asked Holloway whether he was denying that he had been at the victim's house on the day of the murder. When he agreed that he was not there that day, the detectives had him recount all of his movements on the day of the murder. The detectives then told Holloway that he had been identified with relative certainty as the person standing in front of the victim's house and stated, "And it's just kind of confusing how yah could be in two (2) places at the same time." After Holloway denied owning clothing matching the description of that given to the police, the detectives asked if a search of his room would reveal clothing matching the description. He again denied owning the clothing.

[¶ 6] Eventually, the detectives made it clear that they thought Holloway had been at the scene of the crime: "I think it was you that walked right from the ... right from the bottom of the hill, all the way up and, and at some point was standin' right there at [the victim's] house." (Detective Pickett.) "I'll tell yah what, Steve, there's, there's no doubt in my mind, I'll tell yah that right up front." (Detective Parlin.) The detectives repeatedly pointed out inconsistencies in Holloway's story and indicated that they did not find his answers to their questions believable. For example, in response to Holloway's explanation that, despite being down on his luck and without much money or a place to stay, he would not have visited the victim to ask if he could stay with him, Detective Pickett stated, "[b]ut, no I just, it just doesn't make sense, yah know." The detectives again stated that they knew Holloway had been in Wilton on the day of the murder, and eventually Holloway admitted to being in the area. By this time, the detectives had been questioning Holloway for over half an hour without a break.

[¶ 7] Thereafter, Holloway admitted that he had also visited the victim, but left after talking with the victim for roughly half an hour. Following further confrontation by the detectives and escalation in their accusatory questioning, Holloway stated, "I told yah everything," and then asked if he was under arrest. Detective Pickett said he was not. The detectives then offered to send someone out for breakfast in response to Holloway's request to get a drink of water. When Holloway asked for a six-pack of beer instead, the detectives refused, saying they could not do that. Holloway then stated that he had said everything he had to say to the detectives several times in response to their unrelenting questioning. The detectives persisted and Holloway persisted in refusing to answer their questions. Holloway again asked if he was under arrest and when the detectives said no, he asked to end the interrogation so he could contact an attorney. Detective Pickett's response was as follows:

> Well, now that you, now that you bring up, now that you bring up a lawyer, okay, you haven't, you know, you, I mean, you haven't, you haven't said, you know ... [Holloway tries to interrupt] but, but let me, but, but, let me just, now that you brought up the, the thing of a lawyer, let me, let me, let me, let me address that okay? You're not under arrest, as we set right here, you're not under arrest, okay. You're not in custody, I mean, you're not in handcuffs, all right, you're free to get up out of that chair and everything, no one's keeping you confined here and we're just talking, we're talking and trying tah make some sense out of what happened just before yah left [the victim's] house and why he's dead.

Almost immediately thereafter, Detective Pickett told Holloway that the police knew that he killed the victim. Holloway continued to deny knowing anything about the victim's death, denied being the killer and repeatedly told the detectives he had nothing else to say.

[¶ 8] The detectives then took a break in their questioning during which Holloway attempted to ask Detective Parlin to leave, to which Parlin responded: "Okay. I'm just gonna ask you to hold on just a minute ... until I hear from the bosses." In the meantime, Detective Pickett had been speaking with his superior officer who was parked in his cruiser outside of Holloway's motel room. When he returned, the questioning resumed. Shortly thereafter, Detective Pickett told Holloway to sit back down in his seat twice and then told Holloway that the police knew that he killed the victim and knew how he did it. Following an accusatory exchange, Holloway stated to Detective Pickett that he was "in [his] face" and Pickett responded by ordering Holloway to sit back down.

[¶ 9] After more accusations, Holloway attempted to actually leave, at which point Detective Pickett placed him under arrest and gave him a *Miranda* warning.[5] This occurred at approximately 11:35 a.m., roughly an hour and forty minutes after the detectives first started recording their interrogation. Eventually Holloway confessed to the murder, providing the detectives with the details. The interrogation was terminated at roughly 1:10 p.m. after which Holloway was taken to the police station and then to the scene of the crime to assist the officers in finding a set of the victim's keys that Holloway had indicated he had thrown into the snow following the murder. A blood alcohol test was administered at 4:28 p.m. revealing that Holloway had a blood alcohol level of .05% roughly six and a half hours after the detectives began their interrogation.

[¶ 10] Holloway moved to suppress evidence acquired on January 15 and statements made on January 16 in a subsequent questioning session with Pickett. The Superior Court granted his motion with respect to the January 16 statements, determining that Pickett continued to question Holloway despite an invocation of his right to an attorney and noting that Pickett had omitted from his *Miranda* warning a defendant's right to an appointed attorney when he reminded Holloway of his *Miranda* rights at the beginning of the conversation. The State does not challenge this ruling. The court, however, denied the motion with respect to the January 15 interrogation, relying in part on statements made by Holloway on cross-examination that he did not think that he was under arrest because the detectives had told him that he was not under arrest and, when he tried to leave just prior to being arrested, that he did so because the detectives had told him repeatedly that he was not "in custody." The court determined that, although the questioning did constitute an interrogation and not merely an interview, Holloway was not in custody until he was placed under formal arrest. The State does not contest the Superior Court's determination that the questioning constituted an interrogation. Holloway entered a conditional plea of guilty and now appeals the court's ruling on his motion to suppress with respect to his January 15 statements.

## II. THE INTERROGATION

[¶ 11] Holloway argues that he was in custody during the detectives' interrogation even prior to his formal arrest and as a result, his statements to the police should be suppressed based on their failure to provide a *Miranda* warning.[6] He argues that all statements on January 15 following his formal arrest should also be suppressed due to the failure of the detectives to honor his invocation of the right to terminate the interview and consult an attorney while he was in custody. We agree.

**5.** *Cf. United States v. Griffin,* 922 F.2d 1343, 1356 n. 16 (8th Cir.1990) (suggesting "[i]n an appropriate case, a post-interview arrest may suggest an 'end-run' around *Miranda* ").

**6.** As noted above, the State does not contest the trial court's determination that the majority of the detectives' questioning of Holloway constituted an interrogation.

[¶ 12] The State concedes that if we determine that Holloway was in custody at the time he asked that the interview end so that he could consult an attorney *and we determine that he invoked his right to terminate the questioning and consult an attorney unambiguously,* then statements both before and after Holloway's subsequent arrest and *Miranda* warning should be suppressed. The State cites cases involving attempts to invoke the right to remain silent and the right to an attorney subsequent to a valid *waiver* of those rights following a proper *Miranda* warning for the proposition that police need not honor an ambiguous invocation *even in the absence of a prior valid waiver of the right. See Davis v. United States,* 512 U.S. 452, 459–62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (once a suspect has knowingly and voluntarily waived the right to an attorney following a *Miranda* warning, police need only cease all questioning if the suspect subsequently unambiguously invokes the right, however, when invocation is ambiguous, police may inquire further to clarify whether the suspect is in fact invoking the right to an attorney); *State v. King,* 1998 ME 60, ¶ 9, 708 A.2d 1014, 1017 (retraction of a waiver and a reassertion of the right to remain silent must be sufficiently clear to cut off questioning). We decline the State's implicit invitation to extend the holdings in *Davis* and *King,* to require an unambiguous *invocation* of the right to remain silent and the right to an attorney in the absence of a prior waiver. Holloway's statement in this case was a sufficiently clear invocation of his rights. Therefore, we need only determine whether Holloway was actually in custody at the time he invoked his rights in order to determine the admissibility of his post-arrest statements.

[¶ 13] A person subject to interrogation while in police custody must first be given a *Miranda* warning, otherwise statements made in the course of the interrogation will not be admissible against that person. *See Dickerson v. United States,* — U.S. ——, 120 S.Ct. 2326, 2331, 147 L.Ed.2d 405 (2000); *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The determination of whether a person is in custody involves questions of both fact and law. *See Thompson v. Keohane,* 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). Although factual determinations by the trial court merit deference and will be reviewed for clear error, the legal determination merits *de novo* review, therefore the "ultimate determination", i.e., whether an individual is in custody for purposes of *Miranda,* "presents a 'mixed question of law and fact' qualifying for independent review." *Id.*

[¶ 14] As noted above, the salient facts of this case are relatively well-settled. We are therefore called on to decide the legal question of whether the circumstances as they existed during the time of the interrogation constituted custody. In other words, would a reasonable person standing in the shoes of Holloway, "have felt he or she was not at liberty to terminate the interrogation and leave?" *Id.* at 112, 116 S.Ct. 457. Alternately, "[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest?" *Id.* (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)) (alteration in original); *see also State v. Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226.

[¶ 15] The Supreme Court has stressed that this determination is a purely objective one. *See Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"). The subjective intent or beliefs of either the police or the suspect play no role in the legal determination except to the extent that they manifest themselves outwardly and would affect whether a reasonable person would feel

constrained to a degree commensurate with police custody. *See id.* at 325, 114 S.Ct. 1526; *see also Michaud,* 1998 ME 251, ¶ 4, 724 A.2d at 1226.

[¶ 16] Holloway argues as an initial matter that the trial court erred by using his subjective beliefs directly in its custody determination. After noting the factors listed in *Michaud,* the court stated in its opinion: "Another factor, not listed in *Michaud,* which is important in understanding the totality of the circumstances in the present case, is what the detectives told the defendant and *his subjective belief as the result of what he had been told.*" (Emphasis added.) Such direct use of Holloway's subjective beliefs is in direct contravention of *Stansbury.* This case provides a particularly good example of why.

[¶ 17] When, a good way into the interrogation, Holloway asked if he was under arrest, the detectives responded that he was not. Then later, Holloway attempted to terminate the interrogation so that he could contact an attorney, to which the detectives responded by telling him that he was not in custody. The trial court expressed doubt as to the sincerity of these statements, but then went on to determine that Holloway appeared to take the statements at "face value." In other words, when viewed objectively, the surrounding circumstances belied the detectives' statements, however, Holloway did not appear to perceive the nature of his situation in contrast to the detectives' representations. *Cf. Thompson,* 516 U.S. at 103, 116 S.Ct. 457 (observing that although the interrogating officers "constantly" assured defendant that he was free to leave, they also repeatedly told him that they knew he had killed his former wife during a two-hour recorded interview occurring after the defendant appeared at the station house at one of the officer's invitations). The trial court then stated, "[w]eighing all

of the circumstances, and *adding the defendant's own testimony that he believed that he was free to leave and was surprised when he was formally arrested,* the court finds that the interrogation in this case was not 'custodial.'" [7] (Emphasis added.)

[¶ 18] Whether an individual is entitled to constitutionally mandated warnings of his or her rights should not depend on the degree of naivete of that individual when taking police statements at their "face value." *Cf. Dickerson,* ── U.S. at ──, 120 S.Ct. at 2331 (quoting *Miranda,* 384 U.S. at 455, 86 S.Ct. 1602) ("custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals") (internal quotation marks omitted). The court erred as a matter of law by using Holloway's subjective beliefs directly to tip the scale in favor of a determination that he was not in custody at the time of his interrogation. When the facts in this case are instead viewed objectively, the answer to the inquiry regarding "how a reasonable [person] in the suspect's position would have understood [the] situation," *Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)) (internal quotation marks omitted), is: in custody.

[¶ 19] We have noted that a number of factors are relevant when determining whether an interrogation is custodial. *See Michaud,* 1998 ME 251, ¶ 4, 724 A.2d at 1226 (e.g., the locale, the familiarity of the surroundings to the individual, whether the individual is the focus of police investigation (as a reasonable person in the defendant's position would perceive it), whether police initiated the contact). These factors are not to be viewed in isolation, but rather in their totality. *See Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526 ("a court must examine *all of the circum-*

7. On cross-examination Holloway testified that he did not think that he was *under arrest* because the detectives had told him that he was not, and that he attempted to leave just prior to being formally arrested because the detectives had just previously told him that he was not in custody.

*stances* surrounding the interrogation") (emphasis added); *United States v. Jones,* 187 F.3d 210, 218 (1st Cir.1999) (viewing the totality of the circumstances when determining whether the defendant was in custody while questioned).

[¶ 20] The circumstances in this case gave rise to a custodial setting, if not from the outset of the detectives' questioning, certainly when Holloway asked and was denied an opportunity to end the interrogation so that he could contact a lawyer. The detectives initiated the contact with Holloway and it was the detectives who suggested that they conduct their questioning in Holloway's motel room. *Cf. United States v. Beraun–Panez,* 812 F.2d 578, 581–82 (9th Cir.), *as modified* 830 F.2d 127 (9th Cir.1987) (affirming trial court's determination of custody and noting that, despite defendant's familiarity with the area, interrogation took place in an isolated area and "well away from the public view, in a remote area where no passersby would likely be present"). The interrogation was recorded and began with the collection of detailed personal information from Holloway.

[¶ 21] Although much later in the course of the interrogation, the detectives stated that Holloway was not under arrest and not "in custody" in response to his inquiries, the detectives never stated to Holloway at any time prior to his formal arrest that he was free to leave or free to not answer their questions. *Cf. State v. Hewes,* 558 A.2d 696, 698–99 (Me.1989) (affirming trial court's determination of custody *despite* officer telling the suspect prior to his interrogation that he could terminate the interview and leave at any time); *see also Griffin,* 922 F.2d at 1350 ("[T]he absence of police advisement that the suspect is not under formal arrest, or

that the suspect is at liberty to decline to answer questions, has been identified as an important indicium of the existence of a custodial setting."); *Colorado v. Trujillo,* 784 P.2d 788, 789 (Colo.1990) (affirming trial court's determination of custody and noting, *inter alia,* "[a]t no time either before or during the interview did the officer advise the defendant of his *Miranda* rights or tell the defendant that he was free to leave at any time"). The detectives immediately took control of the situation, dictated the terms of the questioning, and later in the interview indicated that someone could be sent to retrieve breakfast, while denying Holloway's request for beer. *See Griffin,* 922 F.2d at 1352 (noting "The *Miranda* court was deeply concerned with the effect of an incommunicado, police dominated atmosphere on a criminal suspect's will to resist self-incrimination during interrogation."); *see also United States v. Johnson,* 64 F.3d 1120, 1126 (8th Cir. 1995) (noting a useful factor when making a determination of custody was "whether the atmosphere was police dominated"). Holloway was never left alone and was always in the presence of at least one police officer.

[¶ 22] For most of the interrogation. Holloway sat with his back to the wall facing the two detectives sitting in close proximity to him.[8] *Cf. Beraun–Panez,* 812 F.2d at 579 (noting "[t]he interrogation took place at the front of the sheriff's pickup, with the defendant, having dismounted from horseback, positioned between the Deputy and Agent Hughes"). The detectives did not disguise the fact that Holloway was their prime suspect,[9] indicating that an individual matching his description had been placed at the victim's house shortly before the murder and stating that they were both sure that it was him. The detectives' questioning quickly assumed an accusatory and rugged tone.[10]

---

8.  *See* note 2, *supra.*

9.  The trial court found "the defendant quickly became the focus of the investigation, a fact which the detectives were quite clear in stating to the defendant."

10.  The trial court found that "[a]lthough the questioning on January 15 began as a general investigation, it quickly became an interrogation as the defendant's answers placed him closer and closer.... Without drawing too

*Cf. Trujillo,* 784 P.2d at 790–92 (affirming trial court's decision that noted "accusatory nature of the questions" was pivotal in its determination that the suspect was in custody at the time of interrogation); *State v. Dedrick,* 132 N.H. 218, 564 A.2d 423, 427 (1989) (noting that police interrogation became custodial when police began to accuse the suspect of the crime and stating "such a change would have signaled a reasonable man in the same circumstances that the freedom officers had accorded him earlier was no longer available and that, as often as he made denials, they would renew their accusations until, in the end, he either confessed or asked, as Dedrick in fact did, to speak with an attorney"). In response to Holloway's answers to their questions, the detectives asked how he could be in two places at once and stated that his explanations did not make sense to them. *Cf. Tankleff v. Senkowski,* 135 F.3d 235, 244 (2d Cir.1998) (determining that the defendant had been in custody and noting "he had been subjected to increasingly hostile questioning at the police station, during which the detectives accused him of showing insufficient grief [about the death of his parents], had said that his story was 'ridiculous' and 'absurd,' and had added that they simply 'could not accept' his explanations"). Not only did the detectives indicate that Holloway was a suspect, but they accused Holloway of committing the murder and then lying to them about it.

▮ [¶ 23] These circumstances, viewed in their totality, would lead a reasonable person to feel constrained to a degree associated with formal arrest, for it would be clear to a reasonable person not very far into the detectives' questioning that he or she was not at liberty to terminate the encounter notwithstanding the detectives' much later representations regarding arrest and custody.[11] As the Eighth Circuit Court of Appeals observed:

> The application of the rule of *Miranda* is not a process to be *avoided* by law enforcement officers. Custody should not be a mystical concept to any law enforcement agency. We see no reason why doubts as to the presence or absence of custody should not be resolved in favor of providing criminal suspects with the simple expedient of *Miranda* warnings.... [T]he effectiveness of law enforcement is not undermined by informing suspects of their rights.

*Griffin,* 922 F.2d at 1356 (emphasis added). Because Holloway also invoked his right to terminate the questioning and consult an attorney after the interrogation became custodial, even his statements following his formal arrest should not have been admitted, as the State has acknowledged. *See also United States v. Ortiz,* 177 F.3d 108, 109 (1st Cir.1999) ("when a suspect asserts his right to counsel, interrogation must cease and the police may not reinterrogate the suspect until counsel is present, unless the suspect himself initiates further conversation"); *State v. Rossignol,* 627 A.2d 524, 526–27 (Me.1993) (invocation of the right to remain silent must be "scrupulously honored"). We therefore vacate the Superior Court's judgment of conviction.

---

fine a line as to when the tone changed from general investigation to interrogation, it was probably crossed when the detectives began accusing the defendant of being in the vicinity of the victim's house...." The trial court also found that the "questioning does get accusatory and rugged as the detectives attempt to get statements from the defendant ...."

**11.** The trial court determined the point at which the detectives' questioning became an interrogation to be page 15 of the interrogation transcript. This determination has not been contested by the parties. A factfinder could determine that the setting had also become custodial by page 15. As a matter of law, however, the setting was unquestionably custodial by page 39 when Holloway, after having been accused repeatedly of being present at the decedent's death, said he wanted to end the interrogation so he could "get a hold of a lawyer" and was not allowed to do so.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.

WATHEN, C.J., with whom CLIFFORD, J., joins, dissenting.

[¶ 24] I must respectfully dissent. In my judgment, the Court misapplies the standard of review set forth in *Thompson v. Keohane*, 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), and engages in a de novo review of both the facts and the law.

[¶ 25] The factual record is somewhat more complete than usual because it includes a transcript of the taped interview. This has led the Court to draw conclusions that are subtly different from the factual findings of the trial court. For example, this Court states that the detectives "did not disguise the fact that Holloway was their prime suspect." The trial court found "the defendant quickly became the focus of the investigation, a fact that the detectives were quite clear in stating to the defendant." In addition, the Court relies on testimony of defendant that is at odds with the trial court's factual findings. This Court credits Holloway's testimony that he could see the detectives' weapons. The trial court found the detectives "made no display of their weapons."

[¶ 26] I agree that it was error for the trial court to consider defendant's subjective reaction to the statement that he was not under arrest. The trial court, however, properly considered the fact that the detectives told Holloway he was not under arrest and appropriately considered the objective impact of that statement on the issue of whether Holloway was free to come and go. *See Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). This Court elevates the trial court's expression of doubt as to the sincerity of the detectives' statements into a finding that "the surrounding cir-

cumstances belied the detectives' statements." The trial court made no such conclusion. The trial court found as a matter of fact that the questioning took place in defendant's motel room, probable cause to arrest the defendant was not present at the beginning of the interview, the plainclothes detectives made no display of their weapons, there was no physical restraint on defendant, he moved around the room and, on one occasion outside of the room without being physically detained, and the questioning was not unduly long. The trial court recognized that the detectives initiated the contact, their questioning became more accusatory as defendant placed himself at the scene of the crime, defendant quickly became the focus of their investigation, and they were highly suspicious of him. The depth of their suspicion, however, is not controlling. As the United State Supreme Court has noted: "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id.*

[¶ 27] Reviewing the facts found by the trial court independently. I conclude that defendant's freedom of movement in his motel room was not restrained to the degree associated with formal arrest until he was arrested. I would affirm the judgment.