STATE OF MAINE
Knox, S.S., Clerk Office
SUPERIOR COURT

AUG 27 2001

RECEIVED AND FILED
Susan Guillette, Clerk

STATE OF MAINE

KNOX, ss.

STATE OF MAINE

v.

MARK HARWOOD,

Defendant

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-99-149
KNO-JRA-8/27/2001 60-073

DECISION AND ORDER
ON DEFENDANT'S
MOTION TO SUPPRESS

## I.   Introduction.

This matter is before the court on the defendant's motion to suppress. By this vehicle, the defendant seeks to suppress all statements made by him to law enforcement officers and any out-of-court or in-court identifications of him. As to the latter request, no testimony was offered as to any out-of-court identifications of the defendant so there is no basis on which to suppress such evidence. By the same token, no basis has been offered to suppress any in-court identification of the defendant.

Instead, the focus of the hearing on this motion was the defendant's contention that his statements to the police were either involuntary or the product of custodial interrogation which was conducted without the benefit of *Miranda* warnings.

As noted, a testimonial hearing was conducted on the motion, no briefs or memoranda were filed, but the motion is nevertheless in order for disposition.

## II.   Facts.

From the evidence which the court finds to be credible, the court makes the following findings:

At about 3:30 in the afternoon of January 12, 2000, a dispatcher reported to Camden police officer Jason Hall that two individuals who had occupied a white pickup

truck were intoxicated and attempting to be admitted to Gilbert's, a local bar. Hall responded to the complaint, but could not locate the white truck.

About one-half hour later, Hall received a second report that a white pickup truck had just struck another vehicle parked on Daley Street in Camden and was headed toward Washington Street by way of Sand Street. Hall responded by driving to Sand Street where he found a white pickup parked on the lawn of the Harwood residence. He knew the defendant, Mark Harwood, lived there and recognized his truck as Hall lived in that neighborhood. The white pickup was extensively damaged on both sides. Officer Hall then called for assistance upon which Officer William Smith of the Rockport Police Department arrived and the two men approached the Harwood home.

About a half-hour before this, Mark Harwood had come home in an intoxicated state, undressed and gone to bed.

One of the officers knocked on the front door window and Richard Harwood, Mark's brother, responded and saw a police officer outside the front door. Richard opened the door and one of the officer's asked if Mark was there. In response, Richard said he was upstairs in bed and motioned in that direction. At this, Officer Hall entered, followed by Officer Smith, ascended the stairs, and approached the defendant's room as Richard had directed. He found Mark Harwood on his bed dressed only in his undershorts. Hall asked him to get dressed because he wanted to talk to him about an accident. Hall descended the stairs and he and Smith then saw Harwood at the top of the stairs fall backwards as he attempted to put on his trousers.

2

Once Mark got downstairs, he had an angry exchange with his brother after Richard refused the former's invitation to come to the station to bail him out. At this point there had been no discussion as to any arrest of Mark for any offense.

Hall, Smith, and the defendant then went outside at the direction of the officers where Mark became upset upon observing the condition of his pickup truck. Because Hall had observed that Mark appeared to be intoxicated, he asked him to perform field sobriety tests. His opinion was confirmed when he interrupted the defendant's performance of the "one-legged stand" test and the "walk and turn" test because of the latter's inability to follow instructions and because the officer believed Mark to be "extremely intoxicated"[1] so much so that he was concerned about another fall.

During the attempts to have the defendant perform field sobriety tests, Officer Hall asked him questions about the accident involving the parked car on Daley Street. In response, Mark made several inculpatory statements, acknowledging that he was the driver in that accident, offering a reason why he did not remain at the accident scene, and advising Hall that he had been in another accident that day in which he had struck a guardrail. In further response to Hall's questions, he also said that he had had eight beers that day, had not eaten in a few days, and should not have been driving. He also told Hall that he had had his last beer at 7:00 p.m. and that the date was the 16th when, in fact, that hour had not yet been reached and the date was the 12th. Officer Hall then arrested the defendant, placed him in handcuffs and had him sit in the cruiser. He next inspected the pickup truck where he found a 12-pack of beer with two bottles remaining.

---

1 There is no transcript of this hearing and the characterizations of the defendant's condition made by Jason Hall in his testimony are placed in quotation marks as reflected in the court's notes which the court believes to be accurate.

The two men then drove to the Camden Police Department while Officer Smith went elsewhere. At the police station Officer Hall read the defendant the *Miranda* warnings, the defendant waived his rights to counsel and to remain silent upon which he made further inculpatory statements in response to the officer's questions. Afterwards, he submitted to an intoxilyzer test which resulted in a .25% blood alcohol content. In Officer Hall's opinion, the defendant was "very drunk," so much so that he offered that, "he could not say the defendant was clear-headed," and that he was "falling down drunk."

## II. Discussion.

The defendant first argues that the officers' entry into his home was unlawful because they did so without a warrant and without consent. Because, he says, the entry was unlawful so was the arrest which resulted from this illegal conduct. Because the arrest was unlawful, he claims that any statements elicited from him and any physical evidence seized from him, such as a breath sample, must be suppressed as "fruit of the poisonous tree."[2] *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

At the outset, it should be observed that Officers Hall and Smith were legitimately on the defendant's property on this occasion. "It is not unreasonable for police officers, in the pursuit of criminal investigations, to seek interviews with suspects or witnesses at their homes." *State v. Rand*, 430 A.2d 808, 819 (Me. 1981). Because the officers had had two reports about potential violations of law with the use of a white pickup truck, including an accident in which the operator left the scene, they were justified in approaching the house where a damaged white pickup truck was found near

---

[2] This basis to support the motion to suppress was not articulated in the motion itself but was argued by counsel at the conclusion of the evidentiary hearing.

to that accident scene shortly after that event had been reported in order to make inquiry as to the truck and its operator. Once there, they could lawfully enter if they had consent to do so.[3]

"The State has the burden to demonstrate by a preponderance of the evidence 'that an objective manifestation of consent was given by word or gesture . . .'" *State v. Cress*, 576 A.2d 1366, 1367 (Me. 1990) (quoting *State v. Fredette*, 411 A.2d 65, 68 (Me. 1979)). Such a manifestation of consent "must be more than a 'mere acquiescence to a claim of lawful authority.'" *Id.* at 1367 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)).

The court concludes that the State has met that burden of proof and that Richard Harwood's actions and gestures can reasonably be interpreted as an invitation to the officers to enter the Harwood home and as voluntary assistance to them as to where to find his brother. This consent was freely and voluntarily given, was in no way coerced, and constituted the necessary manifestation of permission to enter and locate Mark that the law requires. *See id.* Indeed, under these facts, objectively viewed, it is difficult to construct the hypothesis that the officers' entry into the Harwood home was not with the permission of Mark Harwood, who, as a resident, had authority to offer entry to the police.

Once inside the house, Officer Hall did no more than he was permitted. He asked if Mark was present and was advised, by words and gestures, that he could be found in his room upstairs. Such actions were consistent with the previous interaction with Richard and can only be interpreted as an expression of consent, if not direction, to

_____

[3]There was no search warrant and the State has cited no other basis to justify the warrantless entry into the Harwood home except consent.

5

locate Mark at his room. There Officer Hall found the defendant partially dressed on his bed. Rather than speak with him there, the officer asked him to get dressed and come downstairs to discuss an accident -- a reasonable course which served to lessen rather than aggravate any intrusion into the defendant's privacy. What followed thereafter ultimately led the officers to the reasonable belief that the defendant had committed the offense of O.U.I. as they observed obvious indicia of intoxication while dealing with him both inside and outside the house and because they were justified in believing that he had operated the white pickup truck.

From all of this, as noted, the court concludes that the officers were validly within the Harwood home via Richard Harwood's consent. What they observed there, and the actions they took with respect to Mark Harwood, were therefore lawful and not subject to suppression because they did not violate any of his privacy rights protected from unreasonable searches and seizures. U.S. Const., amend. IV. Said differently, the observations the officers made of the defendant's condition and the subsequent arrest and seizure of a breath sample from him were the product of a lawful entry into his home, and were not, therefore, "fruits of the poisonous tree," *Wong Sun v. United States*, 371 U.S. at 488, and will, accordingly, not be suppressed.

The defendant also seeks to suppress the inculpatory statements he made to the police outside his home that evening. He claims that he was in custody at that time, subjected to interrogation and that, because there were no *Miranda* warnings, his statements made under these circumstances must be suppressed.

There appears to be no question that officer Hall interrogated the defendant while he attempted to have him perform field sobriety tests. The question then is whether or not the defendant was in custody during this interrogation so that the

6

*Miranda* warnings were required. "A defendant is 'in custody' if subject to either: (a) a formal arrest; or (b) a 'restraint on freedom of movement [to] the degree associated with a formal arrest.'" *State v. Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226 (quoting *Stansbury v. California,* 511 U.S. 318, 322 (1994)). In this instance, while the officers and the defendant were on his front lawn, the interrogation in question occurred before any formal arrest. Accordingly, the question is narrowed to an assessment of whether or not the defendant was "restrained to the degree associated with a formal arrest" during his questioning. *Id.* The question is answered by ascertaining "whether a reasonable person in the defendant's position would have believed he was in custody and constrained to a degree associated with formal arrest." *Id.* In undertaking this analysis, *Michaud* provides a nonexclusive list of 10 factors to be evaluated.

Applying these factors to the facts in this case, the court concludes that a reasonable person in the defendant's position would have believed he was constrained to a degree associated with formal arrest.

Whether asleep, passed out, or merely resting, the defendant was, while half-dressed, rousted from his bed by a uniformed officer, asked to get dressed and come downstairs to talk about an accident. Once downstairs, however, there was no conversation about an accident while sitting in the security of his home where one might expect an operator to fill out accident forms or be provided with a summons for leaving the scene of an accident. Instead, the officers escorted the defendant outside where, presumably, it was cold and dark, as this was January in the early evening. As the defendant apprehended these circumstances and the likelihood of his arrest, he asked his brother to come to the police station to bail him out.

7

The two police officers, of course, initiated this contact, set the terms of the parties' interaction, including where they would speak. *See State v. Holloway*, 2000 ME 172, ¶ 21, 760 A.2d 223, 230. It is true that they only went a short distance to an area the defendant was familiar with, his front lawn, but there they attempted to have him perform field sobriety tests -- an event that most reasonable people would quickly determine was reflective of police suspicion, if not accusation, of the crime of O.U.I. This was particularly true here where the police had a reasonable basis to believe that the defendant was intoxicated and had been drinking. The defendant, for his part, having been escorted outside, observing his damaged truck, and, perhaps, appreciating to some degree his lack of sobriety as he failed the sobriety tests, must have understood from his participation in these events that the police suspected him of having committed the crime of O.U.I. and that was not free to leave. As such he, or a reasonable person in his circumstance, could only understand that he was the focus of the officers' investigation during the questioning which occurred during the testing process. Indeed, the officers did nothing to dispel the custodial atmosphere they created. Neither assured the defendant he was free to leave or need not go outside with them -- "an important indicium of the existence of a custodial setting." *Id.*, (quoting *Colorado v. Trujillo*, 784 P.2d 788, 789 (Colo. 1990)). Both officers remained with the defendant throughout this event until he was formally arrested.

Officer Hall's questioning, although brief, was pointed and not of the tenor of an informal conversation which, again, would lead a reasonable person to believe that he was the focus of an investigation for committing the crime of O.U.I.

Taking all these circumstances together, the court concludes that this case is distinguishable from the ordinary traffic stop where a few questions are asked and the

8

driver is asked to perform field sobriety tests -- ordinarily, a noncustodial circumstance. *State v. Lewry*, 550 A.2d 64, 65 (Me. 1988). Instead, the interrogation of the defendant here was custodial because a reasonable person in his circumstances would believe that he was "constrained to the degree associated with formal arrest." *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d at 1226. Because this interrogation was custodial and no *Miranda* warnings were provided, the statements the defendant made to Officer Hall during the failed field sobriety tests must be suppressed.

The defendant also challenges the voluntariness of the statements he made at his home and at the police station. He does so because he says he was so intoxicated that his statements were not "the result of the exercise of his own free will and rational intellect." *State v. Caouette*, 446 A.2d 1120, 1123 (Me. 1982). When such a challenge is made, it becomes the prosecution's responsibility to establish beyond a reasonable doubt that the contested statements were voluntarily made. *State v. Collins*, 297 A.2d 620, 627 (Me. 1972).

At the outset, it should be observed that police conduct need not be an element in determining the voluntariness of a statement. *State v. Caouette*, 446 A.2d at 1123. Thus, a statement may be an involuntary one where the police, as in the case at bar, acted properly and engaged in no coercive conduct. Moreover, being under the influence of alcohol does not render a confession per se involuntary. *State v. Clark*, 475 A.2d 418, 420 (Me. 1984). This is so provided, however, the person, despite the degree of intoxication, "is aware and capable of comprehending and communicating with coherence and rationality." *State v. Finson*, 447 A.2d 788, 792 (Me. 1982).

In this case, the court cannot find, beyond a reasonable doubt, that the defendant's statements either outside his home or at the police station were voluntary.

9

The reasonable doubt in this regard stems from the defendant's level of intoxication which causes the court to conclude that the State has not established to this level of proof that the defendant was "capable of comprehending and communicating with coherence and rationality," *id.*, so that his statements can be viewed as the result of the exercise of his own free will and rational intellect." *State v. Caouette*, 446 A.2d at 1123.

The officers' observations confirm this result. After asking the defendant to come downstairs to discuss an accident, they observed him fall down backwards as he attempted to put on his trousers. Although the defendant was able to navigate himself outside, he was physically unable to participate in field sobriety tests which Officer Hall interrupted because the defendant was "extremely intoxicated" such that he might fall down again and could not follow the instructions for the test. He was also unable to give the proper date and the proper time, even though his answers to such questions were responsive. Moreover, Officer Hall opined that as a result of his observations at the police station that the defendant was "very drunk," "falling-down drunk," and that "he could not testify that the defendant was clear-headed." These observations were confirmed by the blood alcohol test which gave a result of a .25 -- a very high test, though not unheard of in O.U.I. cases. Indeed, the only indication of the defendant's rationality is that his answers to questions were appropriate.[4] This factor, while significant in the evaluation of some cases, *see, e.g. State v. Barczak*, 562 A.2d 140, 145 (Me. 1989), is overcome not only by the compelling physical manifestations of intoxication, but by the arresting officer's opinion that the defendant's mental condition was short of being clear-headed, and that he was "extremely intoxicated" and "very

---

[4] Some answers, while responsive, were objectively wrong, however. The defendant was four days off in citing the date to the officers that night.

10

drunk." These observations and the officer's credible testimony compel the court to conclude that the defendant was not "capable of comprehending and communicating with coherence and rationality." *State v. Finson*, 447 A.2d at 792. Accordingly, the court finds reasonable doubt as to the voluntariness of his statements so that they must be suppressed. Consistent with that conclusion the court also cannot find a knowing and intelligent waiver of the defendant's *Miranda* rights as provided to him at the Camden Police Department.[5]

For all these reasons, the motion to suppress is to be granted and any statements the defendant made to Officer Hall are suppressed.

Accordingly, the entry will be:

> Motion to Suppress is DENIED in part and GRANTED in part. It is DENIED as to any evidence seized or observations made by Officers Hall and Smith resulting from their entry into the defendant's residence or from his arrest. It is GRANTED as to any statements the defendant made to these officers on the evening of January 12, 2000, at the defendant's residence or at the Camden Police Department.

Dated: August 24, 2001

John R. Atwood
Justice, Superior Court

---

[5] The interrogation at the police station was, of course, custodial because the defendant had been arrested. Had the waiver of the *Miranda* warnings been knowing and intelligent, and all the statements voluntary, these admissions would probably be admissible notwithstanding the earlier failure to provide *Miranda* warnings at the defendant's residence. *State v. Pinkham*, 520 A.2d 520, 522 (Me. 1986).

11