STATE OF MAINE                                    SUPERIOR COURT
WALDO, ss.                                        DOCKET NO. CR-17-0586


STATE OF MAINE                    )
                                  )
                                  )
                                  )
                                  )
v.                                )    **ORDER ON MOTION TO SUPPRESS**
                                  )
                                  )
                                  )
CHARLES MICHAUD,                  )
                Defendant.        )


Before the Court is Defendant Charles Michaud's Motion to Suppress 1) evidence

obtained as a result of a warrantless search of decedent Georgianna Zercie's cell phone, and 2)

statements obtained as the result of a questioning that occurred in Defendant's apartment and a

confession to two law enforcement officials. The Court finds that Defendant lacked an

objectively reasonable expectation of privacy in the cell phone and **DENIES** Defendant's

Motion in regards to evidence obtained as a result of the cell phone search. However, the Court

finds that law enforcement officials failed to properly deliver *Miranda* warnings to Defendant

before commencing the interrogation. Therefore, the Court **GRANTS** Defendant's Motion in

regards to Defendant's statements and confession.


FINDINGS OF FACT

The Court draws the following facts from the testimonial hearing held on December 11,

2017, and from the evidentiary exhibits proffered by the State.

On April 6, 2017, Officer Robert Shaw of the Rockport Police Department notified

Maine Drug Enforcement Agency ("MDEA") Agent Max King that Georgianna Zercie died of a

1

suspected overdose. Agent King directed Officer Shaw to seize several items from the scene, including three hypodermic needles, a prescription bottle full of liquid, a Ziploc bag of off-white powder, and a cell phone that was identified as belonging to Ms. Zercie. Officer Shaw confiscated those items. Without obtaining a warrant beforehand, Agent King subsequently went through the contents of the phone, which was not password-protected. As a result of the phone search, Agent King obtained text and Facebook messages between Ms. Zercie, Defendant Charles Michaud, and Melody Paul, an individual later identified as Defendant's fiancé. Based on those messages, Agent King believed that Ms. Zercie paid Defendant and Ms. Paul for heroin and fentanyl, which Defendant purchased for Ms. Zercie, through a service called "MoneyGram." The messages included a transaction number, which allowed Agent King to determine that funds had been withdrawn from the Walmart location in Brewer. Agent King obtained surveillance footage from that Walmart location, from which King identified Defendant and Ms. Paul based on their Facebook profile photos. This surveillance revealed what Agent King believed to be Defendant participating in an illegal drug deal. Additionally, the Camden Police Department provided King with a recorded phone call between Defendant and his sister in which Defendant admitted to being responsible for Ms. Zercie's death.

Agent King testified that he and fellow MDEA Agent Jason Pease, dressed in plain clothes, went to Defendant's residence in Bangor on April 9, 2017. They arrived that morning and knocked at Defendant's apartment door, but there was no response. Agent King and Agent Pease subsequently monitored Defendant's driveway from their vehicle for an unspecified duration. Agent King then called Defendant and spoke with Defendant. King identified himself as an MDEA agent and told Defendant that King and Pease "needed to talk with him [Defendant] and it was about his sister."

2

The agents met Defendant at the side door of Defendant's apartment building on the ground level of the residence. Agent King testified that he gave Defendant the option to speak with them outside or inside Defendant's apartment, but Defendant testified that the agents insisted on speaking inside the apartment. In actuality, the agents and Defendant went into Defendant's apartment and spoke to Defendant for approximately 58 minutes.

At the outset of the interaction, Agent King told Defendant that there was an "ongoing investigation with" Ms. Zercie's death and told Defendant: "you're involved in it, okay?" Agent King then asked Defendant if he knew what his *Miranda* rights were. Defendant stated that he had the right to an attorney[1]. Agent Pease then told Defendant: "Yup. Right to remain silent, anything you say can and will be used against you in a court of law, and you have the right to the advice of an attorney, and the presence of an attorney during questioning if you desire, if you wish to answer questions now with or without an attorney present, you can stop any time." Agent Pease also stated that he and Agent King were not there to "force" Defendant to speak with them. At no point did the agents ask Defendant if he would like to waive his *Miranda* rights or tell Defendant that he was free to leave. Additionally, at some point during the interaction, Agent Pease noticed a hypodermic needle on Defendant's apartment floor, at which point Pease told Defendant: "This bothers me when I see this right on the floor in front of my face. Just leave it there, don't touch it." Later in the interrogation, Defendant made statements of a self-incriminating nature in regards to the his sale of fentanyl heroin to Ms. Zercie.

---

[1] At the motion hearing, Defendant testified that by telling the agents that he had a right to an attorney, Defendant intended to terminate the questioning and invoke his right to an attorney. As the Court will later explain, the failure of the agents to confirm whether Defendant wished to have an attorney present or terminate the questioning supports the conclusion that the warnings provided by the agents were inadequate.

3

ANALYSIS

A. Cell Phone Search

"The Fourth Amendment to the United States Constitution and article I, section 5 of the Maine Constitution protect us from unreasonable intrusions of police officers and other government agents." *State v. O'Rourke*, 2001 ME 163, ¶ 16, 792 A.2d 262 (quoting *State v. Caron*, 534 A.2d 978 (Me. 1987)). "In order to challenge the admission of evidence through a motion to suppress, the defendant must first establish that he has standing to make that challenge." *State v. Filion*, 2009 ME 23, ¶ 11, 966 A.2d 405. There is a "two-part inquiry for determining whether a person has a constitutionally protected reasonable expectation of privacy: First, has the individual manifested a subjective expectation of privacy in the object of the challenged search; and second, is society willing to recognize that expectation as reasonable?" *State v. Bridges*, 513 A.2d 1365, 1367 (Me. 1986).

Here, Defendant contends that by virtue of the Maine Probate Code, he had a subjective and objectively reasonable expectation of privacy in Ms. Zercie's cell phone. Defendant cites an intestacy statute for the proposition that "[a]ny part of the estate of a decedent not effectively disposed of by his will passes to his heirs as prescribed in the following sections of [the Probate] Code." 18-A M.R.S. § 2-101. The parties stipulated that Ms. Zercie had no written will. The Probate Code's recognition of the property interests of heirs, Defendant argues, therefore renders his expectation of privacy in Ms. Zercie's estate to which he is an heir is objectively reasonable. Further, Defendant argues that he was involved in the planning of Ms. Zercie's estate and that Ms. Zercie promised to give Defendant certain electronic equipment, thereby showing his subjective expectation of privacy in the contents of her cell phone.

4

Even if the Court assumes *arguendo* that Defendant had a subjective expectation of privacy here, Defendant lacked an objectively reasonable expectation of privacy in the cell phone. There has been no Probate Court adjudication awarding Defendant any property interest in the cell phone, and any assertion of a property interest by Defendant in the phone must compete with Ms. Zercie's other two siblings, Barbara and Kathryn. Furthermore, if Defendant's argument was valid, then any pre-adjudicated claimant to an estate could assert an objectively reasonable expectation in property that he does not even know exists or that a probate court ultimately may award to someone else. This untenable logical consequence of Defendant's argument leads the Court to reject Defendant's argument and find that Defendant lacked an objectively reasonable expectation of privacy in Zercie's cell phone contents[2].

## B. Defendant's Statements and Confession to Police

"A person subject to interrogation while in police custody must first be given a *Miranda* warning, otherwise statements made in the course of the interrogation will not be admissible against that person." *State v. Holloway*, 2000 ME 172, ¶ 13, 760 A.2d 223. Moreover, "*Miranda* has not been limited to station house questioning." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). "[I]n order to demonstrate the admissibility of a suspect's statements during custodial interrogation, the State bears the burden of proving, by a preponderance of the evidence, that (1)

---

[2] A similar scenario has been addressed by at least one federal court. *See McFadden v. Pryor*, No. 12-C-4110, 2015 U.S. Dist. LEXIS 82804 (N.D. Ill. June 25, 2015). In *McFadden*, Plaintiff brought an action pursuant to 42 U.S.C. § 1983 alleging that Chicago police officers destroyed property for which he had an expectation of privacy when the officers raided and searched Plaintiff's mother's house. *Id.* at *2. Plaintiff alleged that he was the only child and only heir of his mother, who since had died, and that Plaintiff had thereby succeeded to the ownership of the property. *Id.* Plaintiff argued that Defendants' unconstitutional search of his mother's home deprived him of his rights under the Fourth Amendment. *Id.* at *6. Despite Plaintiff's plan to become administrator of his deceased mother's estate, the court held that Plaintiff "had no reasonable expectation of privacy in the property." *Id.* at *7. "The fact that he may have lived at the property at one time or *may inherit a future ownership interest in the property is not enough.*" *Id.* (emphasis added). This Court finds the *McFadden* court's reasoning to be persuasive.

law enforcement officers properly delivered *Miranda* warnings to the suspect before commencing the interrogation, and (2) the suspect knowingly, intelligently, and voluntarily waived the privilege protected by the warnings." *State v. Figueroa*, 2016 ME 133, ¶ 14, 146 A.3d 427.

"*Miranda* prescribed the following four now-familiar warnings: A suspect must be warned prior to any questioning 1) that he has the right to remain silent, 2) that anything he says can be used against him in a court of law, 3) that he has the right to the presence of an attorney, and 4) that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Florida v. Powell*, 559 U.S. 50, 59-60 (2010). "The four warnings *Miranda* requires are invariable, but [the U.S. Supreme Court] has not dictated the words in which the essential information must be conveyed." *Id.* "[T]he warnings required and the waiver necessary in accordance with [the *Miranda* decision] are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." *Duckworth*, 492 U.S. at 202 (quoting *Miranda v. Arizona*, 384 U.S. 436, 476 (1966)). "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

The Law Court has identified factors to guide trial courts in their custody determinations. "A defendant is 'in custody' if subject to either: (a) formal arrest; or (b) a restraint on freedom of movement [to] the degree associated with a formal arrest." *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222 (internal citations omitted). "To determine whether a defendant was restrained to the degree associated with a formal arrest, a court must ascertain whether a reasonable person in the defendant's position would have believed he was in police custody and constrained to a degree associated with a formal arrest." *Id.* Courts must inquire: "would a reasonable person

6

standing in the shoes of [the defendant] have felt he or she was not at liberty to terminate the interrogation and leave?" *Holloway*, 2000 ME 172, ¶ 14, 760 A.2d 223. "In making this 'reasonable person' analysis of whether a defendant is 'in custody', a court may examine a number of objective factors, including:

> (1) The locale where the defendant made the statements;
> (2) The party who initiated the contact;
> (3) The existence of non-existence of probable cause to arrest (to the extent communicated to the defendant);
> (4) Subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
> (5) Subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
> (6) The focus of the investigation (as a reasonable person in the defendant's position would perceive it);
> (7) Whether the suspect was questioned in familiar surroundings;
> (8) The number of law enforcement officers present;
> (9) The degree of physical restraint placed upon the suspect;
> (10) The duration and character of the interrogation.

*Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222. "These factors are not to be viewed in isolation, but rather in their totality." *Holloway*, 2000 ME 172, ¶ 19, 760 A.2d 223. "[T]his determination is a purely objective one…The subjective intent or beliefs of either the police or the suspect play no role in the legal determination except to the extent that they manifest themselves outwardly and would affect whether a reasonable person would feel constrained to a degree commensurate with police custody." *Id.* ¶ 15.

The Court finds that a reasonable person in Defendant's position "would have believed he was in police custody and constrained to a degree associated with a formal arrest." *Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222. Although the interrogation occurred at the familiar setting of Defendant's home, Agent Pease and Agent King initiated the interrogation and appeared at a

7

time that Defendant was apparently not expecting them, evinced by Defendant's audibly confused demeanor when he answered the door. Although the agents did not explicitly state that they had probable cause to arrest Defendant, King did tell Defendant that Zercie's death was a "horrible thing" and "you're involved in it, okay?" A reasonable person could understand that as an indication that the police may have had probable cause to arrest him. Although Pease told Defendant he could stop the interview at any time, the agents did not inform Defendant that he was free to leave. Additionally, when Agent Pease commanded Defendant, while he was seated at the table being interrogated, to "just leave [the needle] there, don't touch it," the agents restrained Defendant's freedom to a substantial degree, and a reasonable person could construe that command as an indication that he was "not at liberty to terminate the interrogation and leave." *Holloway*, 2000 ME 172, ¶ 14, 760 A.2d 223. Defendant testified that Agent Pease's command "shut him down" and caused him to believe that the agents would arrest him.

Both of the officers present engaged in the interrogation and the Court finds that the character of the interrogation became accusatory almost as soon as the agents entered the home. A reasonable person would have quickly concluded that the Defendant, as the suspected supplier of the drugs which caused the death of Ms. Zercie, was clearly the focus of their investigation. Therefore, viewing the totality of the circumstances, the Court finds that Agent King and Agent Pease subjected Defendant to a custodial interrogation that a reasonable person would not feel at liberty to terminate and leave.

Having concluded that the totality of the circumstances suggest this Defendant was subjected to a custodial interrogation, the Court must determine whether adequate Miranda warnings were properly provided. It is true that "[r]eviewing courts…need not examine *Miranda* warnings as if construing a will or defining the terms of an easement." *Duckworth*, 492 U.S. at

8

203. "The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Id.* However, the Supreme Court has expressly held that "reference to appointed counsel...linked to a future point in time *after* police interrogation...[does] not fully advise the suspect of his right to appointed counsel *before* interrogation." *California v. Prysock*, 453 U.S. 355, 360 (1981) (emphasis added). In the present case, Agent King and Agent Pease failed to advise Defendant of his right to <u>appointed</u> counsel altogether, let alone his right to appointed counsel before interrogation. Nothing in the warnings they provided would indicate to a reasonable person that an attorney could be provided to him. By failing to inform Defendant of his right to appointed counsel before the interrogation, Agent King and Agent Pease failed to properly administer *Miranda* warnings to Defendant.

Additionally, Defendant testified that by stating "I have the right to an attorney," he intended to request the presence of an attorney and terminate the interrogation. "Even an ambiguous reference by a suspect to have an attorney present requires that further inquiry be made to insure that he is not requesting an attorney and desires to continue the interrogation." *State v. McCluskie*, 611 A.2d 975, 977 (Me. 1992). In this case, both agents failed to confirm whether Defendant wished to invoke his right to an attorney in addition to generally failing to ensure whether Defendant understood his rights. Therefore, the warnings that King and Pease provided to Defendant were not a "fully effective equivalent" to the *Miranda* warnings required by the Supreme Court. *See Duckworth*, 492 U.S. at 202.

The State has failed to meet its burden of proving by a preponderance of the evidence that law enforcement officers properly delivered all four components of the *Miranda* warning to the suspect before commencing the interrogation. *See Figueroa*, 2016 ME 133, ¶ 14, 146 A.3d 427. Moreover, the Court finds that Agent King and Agent Pease failed to confirm whether Defendant

9

was invoking his right to an attorney when Defendant said he had the right to an attorney. Therefore, admitting the statements and confession that King and Pease obtained from Defendant would violate Defendant's Fifth Amendment rights. *See State v. McNaughton*, 2017 ME 173, ¶ 29, 168 A.3d 807 ("[t]he Fifth Amendment privilege against self-incrimination provides a suspect with a right to cut off questioning after he has received *Miranda* warnings and waived those rights"); *United States v. Odeh (In re Terrorist Bombings of the U.S. Embassies in E. Afr.)*, 552 F.3d 177, 199 (2d Cir. 2008) ("the privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial."). Accordingly, the Court grants Defendant's Motion to Suppress the statements and confession obtained during the interrogation in Defendant's apartment.

The entry is:

1. Defendant Michaud's Motion to Suppress evidence obtained from the search of Georgianna Zercie's cell phone is **DENIED**.
2. Defendant Michaud's Motion to Suppress the statements and confession made to Agent King and Agent Pease in Defendant's apartment is **GRANTED.**
3. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Date: ___3/20/18___     _____

Robert Murray
Justice, Maine Superior Court

10