2008 ME 14

**STATE of Maine**

v.

**David N. GRANT.**

Supreme Judicial Court of Maine.

Argued: June 19, 2007.
Decided: Jan. 24, 2008.

Christopher MacLean, Esq. (orally), Elliott & MacLean, LLP, Camden, ME, for appellant.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Andrew B. Benson, Asst. Atty. Gen., Augusta, ME, for appellee.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and MEAD, JJ.*

SAUFLEY, C.J.

[¶ 1] David N. Grant appeals from his conviction for murder, 17–A M.R.S. § 201(1)(A) (2007), upon a jury verdict in the Superior Court (Kennebec County, *Mills, J.*). Grant argues that the Superior Court (*Studstrup, J.*) erred in declining to suppress statements that Grant made to a detective during a custodial interrogation. The questions presented by this appeal are: (1) whether Grant was in custody when he invoked the right to remain silent; (2) whether Grant clearly invoked that right; and (3) if so, whether Grant validly waived his right to remain silent after the right was "scrupulously honored" by law enforcement. We conclude that Grant's statements were properly admitted against him at trial because, although Grant did invoke his right to silence while in custody,

* Justice Susan Calkins sat at oral argument and participated in the initial conference but retired before this opinion was certified.

his rights were scrupulously honored by police. Accordingly, we affirm Grant's conviction but for different reasons than those given by the suppression court.

## I. BACKGROUND

[¶ 2] Although this matter comes before us on appeal from a pre-trial decision on a motion to suppress, the facts that reasonably could have been found by the jury at trial, beyond a reasonable doubt, provide context for our discussion. On November 30, 2004, Grant left his work in the mid-afternoon, purchased cocaine, and after ingesting about a half-ounce of the drug, drove to the home of his mother-in-law in Farmingdale. An argument ensued, and Grant attacked her. When she was dead or nearly dead, he tied her hands behind her back, loaded her into the back of his pick-up truck, and dumped her into an empty field. Her body was found the next day. A later autopsy showed that the cause of her death was blunt force trauma and exsanguination from stab wounds.

[¶ 3] At 11:30 P.M. on November 30, before the body was found, law enforcement officers were dispatched to the scene of a single vehicle accident on Route 2 in Palmyra. At the scene, the officers discovered Grant in the cab of his pick-up truck, which had gone off the side of the road and into a ditch. A considerable amount of blood was observable in the bed of the truck. The police officers found Grant moving about in the cab, waving a knife, and repeatedly thrusting the knife into his own throat. The officers smashed a window of the truck and shocked Grant multiple times with a taser to subdue him. The officers were then able to wrestle away the knife, handcuff Grant, and extract him from the truck.

[¶ 4] Once Grant was out of the truck, officers secured him, handcuffed, to a long board. Grant was placed into an ambulance that had been called to the scene. A law enforcement officer accompanied Grant to Eastern Maine Medical Center in the ambulance. At the hospital, Grant underwent emergency surgery, which was completed in the early morning of December 1.

[¶ 5] In the hours following Grant's surgery, detectives made four attempts to interview him in the hospital at 4:26 A.M., 9:51 A.M., 11:45 A.M., and 1:42 P.M. Grant was not sufficiently conscious or coherent to make a statement during the first three interrogations. During the final interrogation on December 1, at 1:42 P.M., Grant told a detective, in response to his *Miranda* warnings, that he did not wish to talk. The detectives immediately ceased questioning Grant and executed a previously obtained search warrant on Grant's body and clothing. Grant remained hospitalized, and the next day, December 2, a detective returned to the hospital room to question Grant again, beginning at 9:03 A.M. During that interrogation, after receiving new *Miranda* warnings, Grant made numerous incriminating statements.

[¶ 6] On December 29, 2004, Grant was indicted by a grand jury for murder, 17–A M.R.S. § 201(1)(A). He pleaded not guilty and, shortly before the trial date, changed his plea to include a plea of not criminally responsible by reason of insanity.

[¶ 7] After Grant unsuccessfully moved to suppress the statements he made during the December 2 interrogation, a jury trial was held. During the trial, the jury heard testimony about the incriminating statements from the December 2 interview, and the State played a tape of that conversation. The jury found Grant guilty and criminally responsible for murder. Grant was sentenced to a jail term of seventy years.

## A. Grant's Motion to Suppress

[¶ 8] This appeal is generated by the denial of Grant's motion to suppress.[1] Grant does not challenge any aspect of the trial itself. In his motion, Grant argued that he had repeatedly invoked his *Miranda* rights while in the hospital on December 1 and that his statements on December 2 were the product of an illegal interrogation. The court (*Studstrup, J.*) held an evidentiary hearing on Grant's motion to suppress and entered an order denying the motion. Three witnesses testified, each a law enforcement official. Except as indicated, the court found the following facts. These findings were supported by the parties' stipulations, the witnesses' testimony, and other evidence from the suppression hearing.

### 1. Grant's First Three Interviews on December 1

[¶ 9] Detectives first attempted to interview Grant at 4:26 A.M., just after his surgery was completed when he was placed in intensive care. Grant, who was awake but sedated, was read his *Miranda* rights, but his interview was terminated because he was not completely coherent. Grant made a mumbling sound when the detectives asked him if he would like to talk to them later. At 9:51 A.M., a detective again attempted to interview Grant and read him his *Miranda* rights. Grant, who was still in a foggy state of mind, indicated that he did not want to talk and that his throat was sore. At 11:45 A.M., a detective returned to the hospital room, read Grant his *Miranda* rights, and attempted to interview Grant again. Grant indicated that he could not converse because his throat was sore and that he could not write be-

cause his hands were sore. Grant did not respond when the detective asked him if he should return later.

### 2. The 1:42 P.M. Interrogation on December 1

[¶ 10] When the detective returned to Grant's room at 1:42 P.M., Grant stated that he did not want to answer questions. The transcript of the interrogation shows that the following exchange occurred after Grant was read his *Miranda* rights:

Detective: Okay. Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time?

Grant: No.

Detective: What's that?

Grant: No.

Detective: No?

Grant: (inaudible) answer any questions.

Detective: What's that?

Grant: I don't want to answer any questions.

Detective: You don't want to answer any questions?

Grant: No.

The detective immediately ceased questioning Grant and, authorized by the search warrant, executed a search of Grant's body, during which the detective took hand and nail swabbings, nail clippings, pubic hair combings, a penile swab, and a blood sample. Grant remained hospitalized. The officer's questioning of Grant at that interview ceased by 1:50 P.M.

### 3. The 9:03 A.M. Interrogation on December 2

[¶ 11] On the following morning, December 2, the detective learned from nurs-

---

1. Grant also argues that the detectives violated his Fourth Amendment rights and article I, section 5 of the Maine Constitution when they arranged for the hospital staff to secure his clothes while they sought a warrant. We find Grant's argument unpersuasive and do not address it further.

es that Grant had not been given pain medication since the previous afternoon and began another interrogation of Grant, approximately 19 hours after the most recent attempt. Again, the detective read Grant his *Miranda* rights, and Grant acknowledged them. Grant agreed to speak with the detective. During the interrogation, Grant made numerous incriminating statements regarding his relationship with the victim and the events of November 30. The interrogation was terminated at 9:47 A.M., when Grant stated, "I mean I know I've already told you enough to hang me ... but I think I'd really like to have a lawyer present." Grant was released from the hospital later that day and formally arrested.

### 4. Additional Evidence not Addressed by the Court

[¶ 12] There was additional testimony at the suppression hearing, presented by the State and uncontested by Grant, that was relevant to the court's custody determination, but was not explicitly addressed in the court's findings. Although the motion court found that a police officer accompanied Grant to the hospital, the court considered it significant that this officer was not in uniform. The officer testified at the suppression hearing, however, that he had been wearing a gun-belt at the time and he conceded that he had asked Grant at least one question in the ambulance for "law enforcement purposes." This officer also testified that another officer met them at the hospital and accompanied Grant into the hospital while Grant was still wearing handcuffs.

[¶ 13] The transcripts of Grant's interviews show, but the court did not find, that during Grant's first two interviews, the detectives told him that they were looking for the victim, that they knew that Grant had recently been at her home, and that they were investigating the victim's case. These transcripts also show that the detectives made Grant aware that they were receiving updates on his medical condition from the hospital staff.[2]

[¶ 14] In addition, the testimony of the detectives at the suppression hearing indicated that throughout Grant's stay at the hospital on December 1, a law enforcement officer was posted in the hallway outside of his room. The court, however, found that there was "no indication that [Grant] would have had any knowledge of this law enforcement presence."

[¶ 15] The only evidence on that issue came from a detective who testified that guards would sit in a chair in the hallway outside Grant's room and could see his bed, but not always his head, unless he sat up or moved in his bed. This detective testified that he had watched over Grant's room a few times on the day of December 1 and also after the execution of the search warrant on December 1 until midnight on December 2. The detective testified that while he was on watch, Grant rolled over several times, positioned himself so he could look out into the hallway, and then lay back down. The detective could not say, however, during which specific shifts this occurred. The detective who testified on this issue was the same detective who questioned Grant during the 9:51 A.M., 11:45 A.M., 1:42 P.M., and December 2 interrogations.[3]

---

**2.** For example, at one point during the 9:51 A.M. interview Grant was still acting groggy. After Grant asked the detective how he had gotten on Grant's boat, the detectives responded, "Dave, we're not out on a boat and you know that we're not out on a boat.

Okay? You haven't been given a lot of medication. I've talked to the doctors."

**3.** A second detective testified that he had watched over Grant between midnight and 4:00 A.M. on December 2 and that he had

## B. The Motion Court's Findings and Conclusions

[¶ 16]   The motion court concluded that Grant had been in custody from the night of November 30 to the afternoon of December 2 "only in a medical sense" because his confinement was for the purpose of medical care and not for the purpose of a criminal investigation.   The court found that, although Grant had been handcuffed in the ambulance and at the hospital, this was a standard safety precaution.   The court reasoned that Grant came into custody consistent with arrest only at the time the detective executed a search warrant on Grant's body during the 1:42 P.M. interrogation.

[¶ 17]   The court also concluded that because, during all of the December 1 interviews, Grant left open the possibility that he would answer questions at a later time, he did not clearly assert his right to remain silent in a way that would require the suppression of his December 2 statements.   In sum, the court concluded that Grant was not in custody when he said he did not wish to talk and that his statement was not an unequivocal assertion of his right to remain silent.   According to the court's analysis, Grant knowingly waived his *Miranda* rights during the December 2 interrogation, until the point at which he refused to speak without an attorney, which resulted in the end of the interrogation.   Finally, the court determined that Grant's statements were voluntary and that no evidence showed that the State had compelled Grant to speak or that Grant had been incapacitated.

## II.   DISCUSSION

### A.   Standard of Review

■   [¶ 18]   Grant argues that the motion court erred in denying the motion to suppress the statements he made to the detective on December 2. Grant properly challenged the admission of those statements by moving to suppress them pursuant to M.R.Crim. P. 41A. We review the motion court's factual findings for clear error, and we review issues of law and the ultimate determination of whether statements should be suppressed de novo. *State v. Lockhart,* 2003 ME 108, ¶ 15, 830 A.2d 433, 441.

### B.   Admissibility of Grant's Statements

[¶ 19]   We begin with the basics.   For the first 175 years of the existence of the Bill of Rights, the admissibility in U.S. Courts of incriminating or inculpatory statements made to law enforcement officials depended exclusively upon whether the statements were made "voluntarily." *See Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897). Just over forty years ago, the United States Supreme Court concluded that the inherently coercive nature of a custodial interrogation required greater safeguards to ensure the voluntariness of statements made while a suspect was in custody.   In *Miranda v. Arizona,* the Court first required the clear warnings that have since become a familiar part of our cultural lexicon.   384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).   *Miranda* warnings are designed to ensure that a suspect in custody is well aware of his right to remain silent and to consult with a lawyer. *See Id.* at 468, 86 S.Ct. 1602.

[¶ 20]   Almost ten years after *Miranda* was decided, the Court was confronted with the next inevitable question: once a suspect in custody has asserted his now-identified right to remain silent, under what circumstances, if any, may law enforcement attempt to question the suspect

stepped into Grant's room a few times to     check on him.

again? *See Michigan v. Mosley,* 423 U.S. 96, 101–102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The *Mosley* Court created yet another layer of protection for the suspect by creating a more detailed analysis to determine the admissibility of statements made to law enforcement. *Id.* at 104–105, 96 S.Ct. 321. The Court made clear, however, that the invocation of the right to remain silent is not a permanent bar to further police questioning and that incriminating statements given in response to later questioning may be admissible, so long as the defendant's rights were "scrupulously honored." *Id.* at 104, 96 S.Ct. 321.

■ [¶ 21] Thus, when a suspect makes incriminating statements after invoking his right to remain silent during a custodial interrogation and properly challenges the admissibility of those statements before trial, those statements may not be used against the defendant in the State's case in chief in a criminal proceeding unless they were made voluntarily and the defendant knowingly and intelligently waived his or her *Miranda* rights, *see Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602, after having those rights scrupulously honored by the state. *Mosley,* 423 U.S. at 104, 96 S.Ct. 321.

■ [¶ 22] For purposes of our analysis, we will first address whether Grant was in custody on December 1 and whether he unequivocally invoked his right to remain silent. Next, because we do not disturb the motion court's finding that Grant's statements were voluntary, we will address whether Grant knowingly and intelligently waived his right to continue to remain silent on December 2 with particular emphasis on whether his rights were scrupulously honored.[4]

### 1. Custody

[¶ 23] Grant and the State agree that Grant was in custody on December 2, the day he made his incriminating statements. Because Grant was appropriately informed of his rights pursuant to *Miranda,* and waived those rights on December 2, his statements would ordinarily be admissible. The statements would be inadmissible, however if Grant's previous invocation of his right to remain silent was clear, occurred while he was in custody, and if the government failed to scrupulously honor his right after it was invoked. Therefore, we must determine whether Grant was in custody during the preceding interview at 1:42 P.M. on December 1, the interview during which he asserts that he invoked his *Miranda* right to remain silent.

■ [¶ 24] Whether a person is in custody is a mixed question of fact and law. *State v. Holloway,* 2000 ME 172, ¶ 13, 760 A.2d 223, 228. In the context of a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that a suspect was not in custody at the time he or she made incriminating statements. *State v. Hewes,* 558 A.2d 696, 698 (Me.1989). On appeal, we review the motion court's factual determinations for clear error, we review its legal determinations de novo, and we review independently, as a mixed question, the "ultimate determination" of whether the

4. Whether a statement was voluntary, and whether it arose from a knowing and intelligent waiver, are two separate inquires. *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We review for clear error the motion court's determination of whether a suspect's statements were voluntary. *State v. Marden,* 673 A.2d 1304, 1310–11 (Me.1996). The record supports the finding that Grant was alert during questioning and that his statements were voluntary. Nothing in the record suggests that the detective attempted to coerce or threaten Grant before or during this interrogation.

suspect was in custody. *Holloway*, 2000 ME 172, ¶ 13, 760 A.2d at 228. We will not vacate the motion court's custody determination unless "the record fails to rationally support the [court's] finding." *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226.

[¶ 25] Ultimately, whether a suspect was in custody at the time of an interrogation depends upon whether a reasonable person in the suspect's circumstances would have felt that he or she was subject to " 'formal arrest or restraint on freedom of movement' [to] the degree associated with formal arrest." *Holloway*, 2000 ME 172, ¶ 14, 760 A.2d at 228 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)). This analysis is purely objective. *Id.* ¶ 15, 760 A.2d at 228.

[¶ 26] We consider a number of objective factors when analyzing whether a person is in custody, including but not limited to the following:

> (1) [T]he locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant); (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation.

*State v. Higgins*, 2002 ME 77, ¶ 13, 796 A.2d 50, 54–55. These factors are viewed in their totality, and not in isolation.[5] *Id.*

[¶ 27] Referring to these factors, Grant contends that he was subject to a degree of physical restraint tantamount to a formal arrest beginning at the point that he was taken from his truck, and that the detectives' actions during Grant's hospital stay acted to continue his custodial status. On the record before us, we conclude, based on the following analysis, that Grant was in custody during the time he asserted his right to remain silent at the 1:42 P.M. interrogation.

[¶ 28] We first conclude that the motion court erred as a matter of law in determining that Grant was not in custody when he was transported to the hospital. The facts found by the court on this issue are not in dispute. The officers at the scene of Grant's truck accident had to use a considerable degree of force to subdue Grant. He was tasered repeatedly and then forcibly removed from his truck by the police. He was handcuffed and secured to a long board and accompanied by a police officer, armed though not in uni-

---

5.  The delivery of *Miranda* warnings in a noncustodial situation does not render that situation custodial, although it is one factor that we may consider. *State v. Barnes*, 2001 ME 51, ¶ 4, 768 A.2d 596, 597; *see United States v. Harris*, 221 F.3d 1048, 1051 (8th Cir.2000). We give little weight to this factor, however, because law enforcement officials should be encouraged to provide the *Miranda* warnings to suspects during questioning. Law enforcement officials should not hesitate to provide suspects with information about their constitutional rights out of concern that doing so will somehow trigger a custody determination.

form, in an ambulance to the hospital. He was met there by another police officer and remained handcuffed as he entered the hospital to undergo surgery.

[¶ 29] On these facts, the court concluded that the restraints were simply standard operating procedure by the police and that the custody was "medical," and not for law enforcement purposes. We disagree with these legal conclusions. Whether the restraint was accomplished pursuant to standard operating procedure is irrelevant to a reasonable suspect's objective understanding of the limits on the suspect's liberty. A defendant may be in custody when physically restrained by law enforcement officers in an unusual setting or when restrained according to common police policy and practice. Moreover, the police officers' use of the taser and handcuffs, and the persistent presence of law enforcement after Grant's placement in the ambulance far exceeded any restraint that might be used to secure a sick patient on the way to the hospital.

[¶ 30] Accordingly, as Grant went into the hospital for surgery, any reasonable person in his position would have understood himself to be in custody. These circumstances did not change after Grant's surgery was completed and he began his recovery. Following surgery, Grant was subjected to the persistent return of law enforcement to his bedside, and to four attempted interrogations at 4:26 A.M., 9:51 A.M., 11:45 A.M., and 1:42 P.M. The first attempt occurred almost immediately after his surgery, and four of the interrogations occurred within a period of approximately nine hours between the completion of Grant's emergency surgery and the time he asserted his right to remain silent. Grant was subject to these four interrogations within only fourteen hours after his forced removal from his truck. The detectives were never far from Grant's side; they initiated every interrogation, made it known to Grant that they wanted to question him specifically about the victim, and when Grant would not answer questions, made Grant aware that they would return. They also made it clear to Grant that they were tracking his medical condition with the hospital staff.

[¶ 31] Notwithstanding all of these facts, the State urges us to conclude that Grant was *not* in custody, arguing that the interrogation of a patient in a hospital does not amount to a custodial interrogation. *See, e.g., United States v. Martin,* 781 F.2d 671, 673 (9th Cir.1985) (concluding that a suspect was not in custody when he spoke freely with law enforcement officers at his hospital bed and had sought and received treatment at the hospital without any police involvement). The State accurately observes that the mere fact that a suspect cannot leave the hospital as a result of injury or illness does not place that person in law enforcement "custody." In this case, however, it is the other circumstances surrounding the restraints on Grant's liberty that render his interrogation custodial. Indeed, the Ninth Circuit, in the very case relied upon by the State, makes this point eloquently:

This is not to say that an individual would never be "in custody" when held for medical treatment in a hospital. If the police took a criminal suspect to the hospital from the scene of the crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or some combination of these, law enforcement restraint amounting to custody could result.

*Id.*

[¶ 32] Here, the police did indeed take Grant to the hospital, monitor his stay, and station themselves outside his hospital room. Because the standard for determin-

ing custody is an objective one, the question is whether a reasonable person in Grant's position would have been aware of these facts. The constant police presence outside of Grant's hospital room could certainly have affected Grant's understanding of whether he was in custody. If Grant had known that police officers were continuously stationed outside of his room prior to the 1:42 P.M. interrogation, this would be a significant factor in leading a reasonable person in Grant's position to believe that he or she was in custody.

[¶ 33] The motion court found that there was "no indication" that Grant was aware of the police presence on December 1. The record, however, does contain an indication that Grant was aware at some point that there was a law enforcement presence at the door to his hospital room. The detective testifying at the suppression hearing indicated that during his multiple watches over Grant's room on December 1, Grant looked out into the hallway where the officers were located several times, although the detective could not say exactly when or how often these events occurred. Thus, the court factually erred in finding that there was "no indication" that Grant was aware of the police presence on December 1.

[¶ 34] We cannot determine from the record, however, whether Grant in fact knew of the police presence outside of his room *before* the 1:42 P.M. interrogation when he invoked his right to remain silent. Accordingly, the factual error has no effect on our analysis of the custody question.

[¶ 35] In the final analysis, whether Grant was or was not aware that officers were stationed outside his room, he was

well aware that he was the focus of the investigation, that he had been thoroughly restrained upon arrival at the hospital for surgery, that the police were monitoring his medical status, and that the police were regularly present in his hospital room over a fairly short period of time.

[¶ 36] Based on the facts found by the motion court, a reasonable person in Grant's position would have understood himself to be in custody at the time of the 1:42 P.M. interrogation.

## 2. Waiver

[¶ 37] To assess the next question, whether Grant knowingly and intelligently waived his right to remain silent on December 2, we must determine (a) whether Grant effectively invoked that right on December 1, and (b) whether, if Grant clearly invoked his right to remain silent, law enforcement scrupulously honored his invocation before re-initiating questioning and obtaining Grant's incriminating statements on December 2.

### a. Invocation of the *Miranda* Right to Remain Silent

[¶ 38] The State argues, and the court found, that Grant's refusal to answer questions during the 1:42 P.M. interview was too ambiguous, when viewed in the light of his previous refusals, to constitute an invocation of his *Miranda* right to remain silent. *State v. King*, 1998 ME 60, ¶ 9, 708 A.2d 1014, 1017 (holding that an invocation of the right to remain silent must be sufficiently clear that a reasonable police officer would understand the statement to be an assertion of the right to remain silent).[6] We disagree. There was

---

6. Grant's initial refusals to answer questions on December 1 during the 9:51 A.M. and 11:45 A.M. interviews did not operate as invocations of his *Miranda* rights because he indicated, after being asked, that he did not want to answer questions due to his sore throat and hands. Grant does not forcefully argue that those refusals constituted invocations of his *Miranda* rights.

nothing ambiguous in Grant's invocation of his rights during the 1:42 P.M. interview. After the detective recited Grant's *Miranda* rights and asked him if he wished to answer questions, Grant answered, "No," three times and stated, "I don't want to answer any questions." The detective, recognizing Grant's refusal to answer questions, appropriately ceased the questioning.

[¶ 39] Although the interrogating detective testified at the suppression hearing that he had assumed, without asking, that Grant's refusal to speak was because of his sore throat, we conclude that the statements were clear refusals to submit to questioning, and nothing in the record suggests otherwise. *See Davis*, 512 U.S. at 461, 114 S.Ct. 2350 (noting that it is good police practice to clarify whether a suspect is asserting the *Miranda* rights); *State v. Alley*, 2004 ME 10, ¶ 28, 841 A.2d 803, 811. Thus, because Grant unambiguously asserted his *Miranda* right to remain silent during the 1:42 P.M. interrogation, while he was in custody, we must determine whether the police scrupulously honored his invocation of the right to remain silent before Grant made his incriminating statements on December 2. *See Holloway*, 2000 ME 172, ¶ 12, 760 A.2d at 228.

b.  Scrupulously Honoring the Right to Remain Silent

[¶ 40] When a suspect in custody has invoked his or her *Miranda* right to remain silent, the interrogation must cease.

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602 (footnote omitted).

[¶ 41] After a suspect has invoked his right to remain silent, he cannot be found later to have waived that right by responding to later police questioning unless his invocation of that right has been "scrupulously honored." *Mosley*, 423 U.S. at 104, 96 S.Ct. 321; *Holloway*, 2000 ME 172, ¶ 23, 760 A.2d at 231 (citing *State v. Rossignol*, 627 A.2d 524, 526–27 (Me. 1993)).

[¶ 42] However, the in-custody assertion of the right to remain silent does not act as an impenetrable bar to future in-custody questioning. A suspect's invocation of his right to remain silent is considered to have been "scrupulously honored" if the actions of law enforcement following his invocation can survive a four-factor analysis.[7] These factors are: (1) whether police immediately cease the interrogation when the defendant invokes the right to remain silent; (2) whether a significant amount of time passes before questioning is resumed; (3) whether fresh

---

7.  In *Rossignol* we considered the same factors, but referred to the analysis as a three-factor analysis. Other courts have broken the inquiry into four or five factors but in each case the substantive analysis remains the same. *See Weeks v. Angelone*, 176 F.3d 249, 267 (4th Cir.1999); *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir.1992). For ease of analysis on these facts, we refer to the analysis today as having four factors.

*Miranda* warnings are provided; and (4) whether the later "interrogation is restricted to matters distinct from the former." *Rossignol*, 627 A.2d at 527 (interpreting the holding of the Supreme Court of the United States in *Mosley*, 423 U.S. at 104–07, 96 S.Ct. 321).

[¶ 43] Thus, to determine whether Grant's statements to law enforcement on December 2 are admissible, we must determine whether Grant's invocation of his right to remain silent was "scrupulously honored" by law enforcement. Only if Grant's right to remain silent was so honored can we find that the court did not err in admitting his later statements against him.

[¶ 44] At this point in our analysis, we must be clear about the well established, but often confused, distinction in Fifth and Sixth Amendment jurisprudence between the analysis to be applied when determining whether a suspect's invocation of his *Miranda right to remain silent* has been "scrupulously honored," and the analysis applicable to the assessment of whether invocations of the *Miranda right to counsel* have been similarly "scrupulously honored."

[¶ 45] Following the decision of the Supreme Court of the United States in *Michigan v. Mosley*, where the court first declared that invocations of the *Miranda* rights must be scrupulously honored by law enforcement, 423 U.S. at 103–04, 96 S.Ct. 321, federal and state courts, including both this Court and the First Circuit Court of Appeals, *see Rossignol*, 627 A.2d at 527; *United States v. Barone*, 968 F.2d

1378, 1384 (1st Cir.1992); *Weeks v. Angelone*, 176 F.3d 249, 267 (4th Cir.1999), have analyzed the propriety of renewed police interrogation following invocations of the right to remain silent by application of the previously identified multi-factor analysis.[8] *Id.* Each of the questions are considered as *nondispositive* factors that militate in favor of, or against, a conclusion that a suspect's invocation has been scrupulously honored.

[¶ 46] The foregoing analysis differs from the analysis a court must perform when assessing whether renewed police interrogation of a suspect following an invocation of the *right to counsel* is appropriate. When confronted with questions about the propriety of post-invocation questioning concerning the right to counsel, courts are bound by the rule of *Edwards v. Arizona*, which requires that, once an accused has invoked his right to have counsel present, so long as he remains in custody, he may not be subjected to further interrogation until either counsel has been made available to him, or he reinitiates further communication with the police. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Had Grant invoked his right to counsel at the 1:42 P.M. interview, our analysis would be substantially different. Because only the right to remain silent is at issue, we address the renewed police questioning of Grant on the morning following his invocation of the right to remain silent through application of the four-factor analysis applicable to invocations of that right.

---

8. The First Circuit determines whether a suspect's invocation of his right to remain silent was scrupulously honored upon an evaluation of the totality of the circumstances, but has found substantially the same factors particularly important to its analysis of the question. *See Barone*, 968 F.2d at 1384; *see also United*

States v. Thongsophaporn, 503 F.3d 51, 56 (1st Cir.2007). Even after the First Circuit indicated that examining the totality of the circumstances was appropriate, we have relied entirely on the identified factors. *Rossignol*, 627 A.2d at 527.

[¶ 47] For context in applying that test, we return to *Mosley,* in which this analysis was first described. There, a suspect was arrested for robbery in the early afternoon and informed of his *Miranda* rights. 423 U.S. at 97, 96 S.Ct. 321. During questioning, the suspect invoked his right to remain silent. *Id.* Following his invocation of that right, the suspect was placed in a cell, and left alone for over two hours. *Id.* at 96–8, 96 S.Ct. 321. Later that same evening, an officer retrieved him from the cell, provided him with a new set of *Miranda* warnings, and began questioning him about a homicide unrelated to the robbery he had been questioned about earlier. *Id.* In these circumstances, the Court concluded that Mosley's right to remain silent had been scrupulously honored because: (1) the police immediately ceased questioning Mosley when he first invoked his *Miranda* right to remain silent, (2) Mosley was not subjected to questioning again until more than two hours had passed, (3) he was provided with a new set of *Miranda* warnings when he was questioned the second time, and (4) when he was questioned again, those questions related to a matter that was entirely distinct from the first one about which he had been questioned. *Id.* at 104–05, 96 S.Ct. 321.

▆▆▆ [¶ 48] In the matter before us, the record establishes that the police immediately ceased their questioning of Grant when he invoked his *Miranda* right to remain silent during the 1:42 P.M. interrogation. They did not speak to him through the remainder of the afternoon and evening, and did not return until 9:03 A.M. the following day. It is also clear that, when questioning did resume, Grant was given fresh *Miranda* warnings, which he acknowledged that he understood. The subject matter of the police questioning at 9:03 A.M. on the day after Grant invoked his *Miranda* right to remain silent was the same as it had been the previous day.

[¶ 49] Given these facts, we have no difficulty saying that two of the four factors militate in favor of a conclusion that Grant's invocation of his right to remain silent was scrupulously honored: (1) questioning ceased as soon as Grant invoked his right to remain silent without further badgering or pressure to speak, and (2) Grant was given fresh warnings before being questioned again.

[¶ 50] Conversely, the fourth factor weighs against the State because both sets of questions related to precisely the same issues.

[¶ 51] The final remaining factor requires further discussion: whether a significant period of time passed between the invocation of the right to remain silent and the questioning that followed. Here, although Grant was recovering from several injuries in the time between his invocation of his right to remain silent and law enforcement's renewed questioning, over nineteen hours had elapsed between Grant's 1:42 P.M. invocation and the resumption of questioning at 9:03 A.M. the following day. Additionally, the court found that Grant was not given new pain medication between the 1:42 P.M. and 9:03 A.M. interrogations, which lessens concerns that medication had diminished Grant's lucidity and interfered with his ability to think about his circumstances during the substantial period between his invocation and law enforcement's renewed interrogation the following day. Thus, following his invocation of his right to remain silent, Grant had over nineteen hours to contemplate his situation before the officers recommenced their interrogation the next day. This factor weighs in favor of a finding that Grant's invocation of the right to remain silent was scrupulously honored.

[¶ 52] In sum, three of the four *Mosley* factors weigh in favor of concluding that Grant's invocation of his *Miranda* right to remain silent was scrupulously honored. We conclude that taken as a whole, the conduct of the police did scrupulously honor Grant's invocation of that right. The police clearly and regularly advised Grant of his rights and ceased questioning upon his invocation of his right to remain silent. On December 2, the officers continued to scrupulously honor his right to remain silent by waiting for nineteen hours before approaching him again and giving him fresh warnings at that time.

[¶ 53] Although Grant's statements were admitted on other grounds, the statements were admissible based on our analysis above. The court's denial of Grant's motion to suppress must be affirmed.

The entry is:

Judgment affirmed.