# IN THE COURT OF APPEALS OF IOWA

No. 3-968 / 12-2229
Filed May 14, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**THADDEUS JOHN ELLENBECKER,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Winnebago County, Stephen P. Carroll (suppression) and DeDra L. Schroeder (trial), Judges.


Thaddeus Ellenbecker appeals his second-degree arson and second-degree burglary convictions. **REVERSED AND REMANDED.**


Timothy L. Lapointe of The Law Offices of Timothy L. Lapointe, P.C., Mason City, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller and Scott D. Brown, Assistant Attorneys General and Adam D. Sauer, County Attorney, for appellee.


Heard by Doyle, P.J., and Tabor and Bower, JJ.

**BOWER, J.**

Former Forest City Police Officer Thaddeus Ellenbecker appeals his convictions for second-degree arson (police building) and second-degree burglary (another officer's gun). *See* Iowa Code §§ 712.1, .3, 713.1, .5(1) (2011). Ellenbecker claims the district court erred in declining to suppress statements he made to agents of the Iowa Department of Criminal Investigation (DCI) in violation of his constitutional rights.[1]

We conclude Ellenbecker was in custody when a DCI agent seized him and pinned him against the wall of his apartment complex before a second agent shot him in the leg. Ellenbecker was still in custody when the DCI agents later questioned him in the hospital without advising him of his *Miranda* rights. Accordingly, we reverse and remand for a new trial.

## I.  BACKGROUND FACTS AND PROCEEDINGS

In July 2009 Ellenbecker was hired as a police officer by the Forest City Police Department. Ellenbecker moved from Minnesota to Forest City, but his wife and children maintained a residence in Minnesota. Shortly thereafter, Ellenbecker reported the Iowa house he was renting in a remote area had been the subject of a drive-by shooting. In November 2010, after Ellenbecker helped Officer Carrie Seiberlich start her patrol car, a rifle was stolen from her locked car trunk.

In early September 2011, the Forest City police station was vandalized, including a spray-painted statement, "Pigs Will Die." On October 1, 2011, shortly

---

[1] We need not address the other arguments Ellenbecker raises on appeal because we conclude the custody issue is dispositive, requiring a remand for a new trial.

after Ellenbecker finished his work shift, a fire occurred in the evidence room of the Forest City police station. Three days after the fire, on October 4, Ellenbecker reported he had been assaulted in the police station's garage.

Based on the above incidents, the Forest City Chief of Police requested the DCI conduct an investigation of Ellenbecker. All of the DCI interviews were recorded.

**A. October 10—First Interview.** After the fire, the Forest City police department operated out of the county's law enforcement center temporarily. On October 10, 2011, DCI Agent Callaway asked Ellenbecker to answer some questions and met with him at the center. Agent Callaway recognized Ellenbecker as a 2010 participant in a three-day training seminar Callaway co-taught on "suspect interviews"—exploring circumstances when *Miranda* warnings are required. Ellenbecker did not make any incriminating statements and denied involvement in the fire.

**B. October 20—Second Interview.** On October 20 Callaway again asked Ellenbecker to answer questions. Callaway agreed to meet Ellenbecker at the law enforcement center. Ellenbecker voluntarily came to the building. Ellenbecker needed to "buzz in" to enter the building, but he could exit at any time by pushing on an exit door. Callaway testified[2] Ellenbecker was familiar with the building. Callaway did not have a visible weapon, and he asked Ellenbecker to check his gun. Ellenbecker checked his gun without complaint and received

---

[2] References to the testimony of DCI Agents Callaway, Peterson, Krapfl, Turbett, Hedlund, or Thiele, refer to the agents' testimony at the June 18, 2012 hearing on Ellenbecker's motion to suppress evidence.

the key to the lock box holding his gun. Ellenbecker possessed his cell phone at all times.

After a discussion about the assault, which Ellenbecker alleged occurred on October 4, Ellenbecker agreed to take a polygraph test. DCI Agent Peterson conducted the test and testified Ellenbecker was agreeable to testing. Peterson told Ellenbecker "he was free to leave, the door was unlocked, [and] you can leave anytime you want to." Ellenbecker took and failed the polygraph test.

After the test, Agent Callaway resumed his conversation with Ellenbecker, who repeatedly asked if he was under arrest and whether he could leave. Callaway repeatedly stated Ellenbecker was not under arrest and was "free to go." Callaway described Ellenbecker's decision to leave the building: "One of the last times [Ellenbecker] asked if he was free to go and I responded, yes, you are, he gathered up his stuff and walked out, walked down the steps and out the front door." Ellenbecker left his gun behind in the lock box.

Callaway followed Ellenbecker down the steps and continued to talk with him outside the building. Callaway was concerned about Ellenbecker's "fatalistic" demeanor. When Ellenbecker started walking away from the building, Callaway walked with him. Callaway testified he did not know where Ellenbecker was going but accompanied him due to his hope Ellenbecker "would come back in and talk to me, that I could persuade him to come back in and tell the truth. That was the initial part of the walk."

The walk lasted "about seven blocks." Callaway testified Ellenbecker talked about being a failure but also stated "he wasn't going to hurt his wife or his

kids." As they walked, Callaway continued his efforts to "persuade [Ellenbecker] to come back and talk," telling Ellenbecker his situation is "not as bad" as he "might think it is." Callaway explained:

> Q. Were you concerned about [Ellenbecker's] personal physical safety? A. Yes.
> Q. Why is that? A. Just from twenty-one years of law enforcement and thousands of contacts with the public . . . . I felt he was at the point where . . . he was talking about being a failure, very, very depressed.

During the walk Ellenbecker used his cell phone to call his wife but did not reach her. Callaway saw Ellenbecker brighten up when the walk ended at the parking lot of Ellenbecker's apartment complex and Ellenbecker saw his wife's car. Callaway testified Ellenbecker stated, "Let me go in and talk to my wife and then I'll come back out and talk to you." Callaway asked Ellenbecker if he had any guns inside. Ellenbecker said he did not and entered the apartment complex.

Callaway stayed outside and called Agent Peterson, telling him Ellenbecker wanted to continue talking after speaking with his wife. Callaway asked Peterson to come to the apartment complex.

After Ellenbecker had been inside about six minutes, Callaway saw him come outside with his wife and two young children. The couple put the children into a car. Callaway heard Ellenbecker tell his wife to leave. Ellenbecker then yelled to Callaway to come over and talk to his wife. As this conversation was starting, Ellenbecker walked away, heading toward the apartments. Callaway testified because he did not know what Ellenbecker had already told his wife, he asked Ellenbecker to come back. In response, Ellenbecker "stopped and pivoted

. . . and pulled his coat back." Callaway then saw Ellenbecker had a handgun. Callaway again asked Ellenbecker to stop and come back, and Ellenbecker turned and walked away. Callaway ran, caught up to Ellenbecker near the building, and "pinned him against the door of the apartment complex." Callaway and Ellenbecker struggled as Callaway attempted to prevent Ellenbecker from "pulling his gun out of his holster." Callaway testified he took these actions because he was concerned about what Ellenbecker intended to do inside the apartment.

Agent Peterson testified he heard yelling when he arrived at the complex and then as he approached the struggling men. Peterson observed Ellenbecker had a firearm on his hip and Callaway had Ellenbecker "pushed up against this back door of the apartment." Peterson testified as the Callaway-Ellenbecker struggle moved from the alcove's door to the corner, he saw Ellenbecker's "hand go toward his gun." Peterson shot Ellenbecker in the leg and called 911. Numerous officers arrived, including Iowa State Trooper Duenow.

Callaway secured Ellenbecker by holding his hands while they waited for the ambulance. After Callaway was provided with a pair of handcuffs, he handcuffed Ellenbecker. Callaway explained: "Once we had secured his gun and gotten that away from him, once we secured the scene, made sure nothing else was going to happen, the ambulance personnel took over the first aid . . . and the handcuffs were removed."

Ellenbecker was placed in the ambulance and taken to the hospital in Mason City. During the ambulance ride, Ellenbecker was not in handcuffs, but he was accompanied by Trooper Duenow.[3]

At the suppression hearing, Callaway testified he did not place Ellenbecker under arrest and told "everybody"—Ellenbecker, Ellenbecker's wife, the responding police officers, and the ambulance crew.

**C. Third Interview.** At the Mason City hospital, Ellenbecker was treated in the emergency room and then moved to a hospital room. Ellenbecker was not restrained while in the hospital.

When DCI Agents Krapfl and Turbett arrived at the hospital around 11:00 p.m. on the evening of the shooting, Troopers Duenow and Knutson were in Ellenbecker's room. The troopers were in uniform.[4] Turbett testified that he believed Duenow was Ellenbecker's "acquaintance or even a friend level" and neither trooper was there at his request or, to his knowledge, at the request of a law enforcement officer. Agents Turbett and Krapfl were unarmed and dressed casually in blue jeans. They did not place a guard outside Ellenbecker's room.

Agent Turbett spoke with a nurse, identified himself, stated they wanted to talk to Ellenbecker, and asked the nurse about Ellenbecker's medications. The nurse told Turbett "it would be a good time," Ellenbecker's "ability to reason and communicate would not be impaired." While Turbett spoke with the nurse, Krapfl spoke with Duenow in the hallway outside the room:

---

[3] Agent Peterson testified: "I thought I heard someone yell for [Duenow] to jump in the ambulance with Thad Ellenbecker."

[4] Agent Krapfl testified Duenow told him that he had been with Ellenbecker the entire time.

Q. Whenever Duenow came out to talk to you, did Knutson stay behind? A. Actually I think Trooper Knutson came out of the room and went down the hallway, he may have been on the phone, and somebody—one of the nursing staff went in. There was always somebody in the room.

After Turbett and Krapfl entered Ellenbecker's room, Turbett initially asked, "We just wanted to talk about what happened earlier tonight and [get your] side of the story. Would it be all right if we sit down and talk a little bit?" Ellenbecker replied, "Yeah, Yeah." The agents did not give *Miranda* warnings to Ellenbecker. The door to his hospital room was open. Duenow stayed on the floor but was not in the room during the interview. During the two breaks in the interview process, Duenow returned to Ellenbecker's room. Krapfl testified the purpose of the breaks was so he could call "either Special Agent in Charge Larry Hedlund or Chris Callaway" to pass on the information they obtained. Turbett testified, "I don't recall specifically who I spoke to." Medical staff entered and left the room during the interview.

Ellenbecker and the agents discussed his non-hospital medications. Ellenbecker talked about the incident at the apartment complex, stating he told Callaway to stay outside and "had no intentions of hurting anybody other than [himself]." Krapfl told Ellenbecker that Callaway had been concerned about him and that is "the only reason he put handcuffs on you. Okay. He is not mad at you, he didn't arrest you." Ellenbecker made several incriminating statements, followed by:

> Ellenbecker: . . . . Am I [going to] get arrested tonight?
> Agent Krapfl: I don't know yet. We just want to get all this stuff out and get to the truth about all this stuff and we'll figure that out later.

Agent Turbett: [We] didn't come here to do that; we just came to talk.

During the interview, Ellenbecker repeatedly stated he was a failure. Krapfl told him they were going to have Duenow come in and be with Ellenbecker to make sure he did not hurt himself while the agents took a break. When the agents returned, Krapfl explained to Ellenbecker that the agents had talked to the medical staff and the staff had then arranged for a medical person to be in Ellenbecker's room all night.

Ellenbecker's wife and brother were in the room when the agents returned from a break. After greetings were exchanged, Agent Turbett asked Ellenbecker, "There [were] just a couple things I didn't ask you; can I ask you a couple things real quick?" Family members attempted to stop Ellenbecker from responding, but Ellenbecker repeatedly silenced them, stating, "It's fine." Ellenbecker answered the additional questions. The interview started around 11:25 p.m. and concluded around 1:35 a.m.

**D. October 21—Fourth Interview.** Five hours later, on October 21 at 6:31 a.m., DCI Agent Hedlund called Ellenbecker and informed him DCI agents were at his parents' house in Minnesota. Hedlund asked questions, and Ellenbecker made incriminating statements.

Later that morning, at 10:40 a.m., Hedlund and DCI Agent Anderson arrived at the hospital to interview Ellenbecker. First, Hedlund told Ellenbecker the lady sitting in his room was not a guard. Ellenbecker stated he understood and knew why she was there—to make sure he did not harm himself. Shortly thereafter, a doctor entered the room. Hedlund asked three more questions

before excusing himself, saying he would be right back. The doctor spoke with Ellenbecker. Hedlund returned to the room. Ellenbecker made incriminating statements. Ellenbecker told Hedlund that the agents who questioned him last night "taught an interview and interrogation class."

> Q. Well, if you had a guy handcuffed to the wall at the police department, he's in custody, right? A. Yeah.
> Q. Okay. And what do you have to do before you talk to him if he's chained to the wall or he's in custody? A. If he doesn't have the option to leave, you have to *Mirandize* him.
> Q. Right. That's custodial interrogation. A. (Sigh) (Unintelligible).
> Q. Those agents that interviewed you last night . . . they didn't *Mirandize* you, did they? A. No.
> Q. Yeah. I wouldn't . . . have thought they did, because you obviously weren't in custody, you're in the hospital. That lady's not here because she's your jailer, she's here because . . . . A. Because she's a good woman.
> . . . .
> Q. You understand you're not in our custody, right? A. Not yet.
> Q. Not yet. Well . . . . [Y]ou're certainly not in custody.[5]

Agent Anderson asked a few questions. Near the end of the interview Hedlund again stated, "But you're not in custody of the police department, you're not in custody of the DCI, you're not in the custody of state patrol or the sheriff's office or anybody. You understand that?" Ellenbecker replied, "Should be." The interview ended around 11:50 a.m.

At 12:35 p.m., forty-five minutes after the interview ended, Hedlund went to the hospital room, asked Ellenbecker to wake up, and stated: "I'm officially telling you you're under arrest . . . . [A]s of this time you're in custody."

---

[5] We apply a consistent, objective reasonable-man standard, not a subjective, reasonable-officer standard. It is irrelevant to our analysis that Ellenbecker had received training on custodial interrogations.

Three days later, on October 24, Agent Thiele went to the hospital room and asked Ellenbecker to talk with him. Ellenbecker declined.

**E. Pretrial and Trial.** After Ellenbecker was charged, he filed a motion to sever the trial on the burglary and the arson counts and a motion for change of venue. Both motions were granted. Ellenbecker also filed a defense of diminished responsibility.

In May 2012 Ellenbecker filed a motion to suppress,[6] asserting the DCI agents' questioning on October 20-21 violated his "constitutional rights under both the Constitution of the United States and the Constitution of the State of Iowa." Ellenbecker claimed his statements were without the protection of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (requiring suppression of statements made "in custody" without adequate warnings).

At the evidentiary hearing on the motion, defense counsel claimed Ellenbecker was in custody on October 20—although the agents told him he was free to leave the law enforcement center, "he's essentially hounded to the doorway . . . . [Ellenbecker] is not allowed to do as he would like at that point in time, in fact he's shot when he tries to do what he would like." Counsel also

---

[6] Ellenbecker also claimed his incriminating statements were involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'"). Defense counsel claimed if Ellenbecker seemed suicidal, then the agents were on notice "he has some mental health issues that need to be addressed." Counsel also claimed the incriminating statements after Ellenbecker was given "pain medication" were involuntary. A Mason City hospital pharmacist testified to the medications Ellenbecker received in the hospital. On cross-examination, the pharmacist admitted he was not a part of Ellenbecker's treating team, the drugs given "are within normal therapeutic levels," and he had no idea "what specific effect" the drugs had on Ellenbecker.

claimed custody on October 21 is shown by Ellenbecker being "continuously"

within the presence of law enforcement at the hospital.

In September 2012 the district court denied Ellenbecker's motion to

suppress, stating:

> In summary, officers did not summon Ellenbecker to the hospital. The agents were courteous and Agents Krapfl and Turbett were in civilian clothes. Defendant was not handcuffed during the interview or otherwise restrained by the officers. Defendant was not isolated. Doctors, nurses, and family members all had access to the Defendant. Defendant was not constrained by the police officers. Defendant's freedom of movement was not restricted by the police officers but only by his medical condition. No guards were posted at the Defendant's hospital door until after his arrest. They were not there during the interview. The agents checked on the Defendant's medical condition and on the drugs he ingested before questioning the Defendant. The Defendant was cooperative. In fact, at one point when admonished by his brother not to talk to law enforcement officers, he admonished his brother, telling him to keep quiet.

The court concluded Ellenbecker "was not in custody," and his statements "were

made voluntarily and were free from coercion."

Ellenbecker waived his right to a jury trial, and bench trials were held in

September (arson) and October (burglary) 2012. In separate November rulings,

the court found Ellenbecker guilty of second-degree arson and second-degree

burglary. This appeal followed.

## II.      Standard of Review

"Under both the State and Federal Constitutions," we review constitutional

claims de novo. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012).

### III. Custodial Interrogation

On appeal, Ellenbecker asserts a *Miranda* violation. *See Miranda*, 384 U.S. at 444. To bring a viable claim, Ellenbecker must have been "in custody" during an "interrogation." *See State v. Davis*, 446 N.W.2d 785, 788 (Iowa 1989). Iowa has adopted the *Miranda* court's "definition of custodial interrogation as the 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any way.'" *Id.* (quoting *Miranda*, 384 U.S. at 444).

This court's determination of "custody" is based "on the objective circumstances of the interrogation, not on subjective views harbored either by the officer or the person being questioned." *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997) (stating the length of a three-hour conversation with breaks did not render the interrogation custodial). The objective, "reasonable person" test we apply is "whether a reasonable person in the [defendant's] position would understand himself . . . to be in custody." *Id.* at 558. We examine the totality of the circumstances, guided by four factors: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of [his] guilt; and (4) whether the defendant is free to leave the place of questioning." *Id.*

The State argues Ellenbecker was not in custody because the agents' actions at the apartment complex were necessary for "medical" and "public interest" purposes—to insure Ellenbecker would not hurt himself. The district court agreed and found: "Although defendant was disabled by being shot by

Agent Peterson, he was in that position because of his own actions. [The agents] reacted to the defendant out of a well-grounded fear for their own safety, the safety of the defendant, and of his family."

The opposite conclusion was reached by the Maine Supreme Judicial Court in *State v. Grant*, 939 A.2d 93, 101-02 (Me. 2008), where roadside officers used "a considerable degree of force to subdue" Grant, including using a Taser on him repeatedly. The officers handcuffed Grant before and during his ambulance ride to the hospital, where he underwent surgery. *Grant*, 939 A.2d at 101. We agree with and adopt the Maine court's analysis:

> [T]he [district] court concluded that the restraints were simply standard operating procedure by the police and that the custody was "medical," and not for law enforcement purposes. We disagree with these legal conclusions. Whether the restraint was accomplished pursuant to standard operating procedure is *irrelevant to a reasonable suspect's objective understanding of the limits on the suspect's liberty.* A defendant may be in custody when physically restrained by law enforcement officers in an unusual setting or when restrained according to common police policy and practice.

*Id.* at 102 (emphasis added).

As in *Grant*, we conclude Ellenbecker was in custody from the point the DCI agent chased him, caught him, struggled with him, and prevented him from returning to his apartment by physical force. This custodial restraint continued uninterrupted as Ellenbecker was shot by a different agent and physically restrained until an ambulance arrived—including a period of restraint with handcuffs. A trooper rode in the ambulance to the hospital. Despite the agents' statements to the contrary during the subsequent hospital interviews, the overall facts and circumstances unequivocally show Ellenbecker was not "free to leave"

and "a reasonable person in [his] position would have understood himself . . . to be in custody"—his freedom of action was foreclosed by the DCI agents. *See Countryman*, 572 N.W.2d at 558.

The State also claims Ellenbecker was not in custody in the hospital because the only restraint imposed on his freedom of movement was his need for medical treatment. Iowa case law attempts to distinguish "cases in which hospital interrogation was marked by police detention and coercion and those cases in which the patient's detention resulted purely from ongoing medical treatment." *State v. Cain*, 400 N.W.2d 582, 584 (Iowa 1987) (ruling defendant was not in custody during brief questioning while undergoing treatment at the hospital emergency room—defendant had voluntarily come to the emergency room for treatment without any prior police presence).

The district court set out factors to be considered in determining whether Ellenbecker had been subjected to custodial interrogation in the hospital:

> (1) whether non-law enforcement agents (such as medical staff and visitors and family of the patient) were present during questioning;
> (2) whether there was a constant police presence at the hospital, including the presence of a police guard;
> (3) whether the police prevented the criminal suspect from leaving the hospital;
> (4) whether the patient agreed to the police interview;
> (5) whether the suspect was under arrest at the time of the interview;
> (6) whether the interrogating officers were in uniform and armed; and
> *(7) whether the defendant had been transferred to the hospital after being previously within police custody*.

(Emphasis added.); *see* Kimberly J. Winbuth, Annotation, *What Constitutes Custodial Interrogation at Hospital by Police Officer Within Rule of* Miranda v.

Arizona *Requiring that Suspect Be Informed of His or Her Federal Constitutional Rights Before Custodial Interrogation—Suspect Hospital Patient*, 30 A.L.R. 6th 103 (2008). The district court's starting point for its analysis was the time when Ellenbecker was in the hospital—"to begin with, Ellenbecker was not summoned to the hospital setting. Police officers did initiate contact . . . but before they interviewed him, they spoke with hospital personnel about his medical condition."

We, however, turn to factor seven—whether Ellenbecker was transferred to the hospital "after being previously within police custody." We again find guidance in the *Grant* decision:

> The State accurately observes that the mere fact that a suspect cannot leave the hospital as a result of injury or illness does not place that person in law enforcement "custody." In this case, however, it is the other circumstances surrounding the restraints on Grant's liberty that render his interrogation custodial. Indeed, the Ninth Circuit . . . makes this point eloquently:
>> This is not to say that an individual would never be "in custody" when held for medical treatment in a hospital. If the police took a criminal suspect to the hospital from the scene of the crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or some combination of these, law enforcement restraint amounting to custody could result.

939 A.2d at 102 (quoting *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (concluding suspect was not in custody when "there are no facts to indicate law enforcement officials were in any way involved in Martin's hospitalization")). Many of the *Grant* factors are present here and show Ellenbecker's custody was not somehow interrupted and discontinued such that *Miranda* warnings were rendered unnecessary.

Specifically, when he was called in for a second interview and thereafter failed a polygraph test, it was clear Ellenbecker "was the focus of the investigation." *See Grant*, 939 A.2d at 103. Ellenbecker was in police custody at the time he was physically restrained and shot at his apartment complex. Not only did the DCI agents initiate contact with Ellenbecker in the hospital, their prior custodial actions put him in the hospital and an officer accompanied him on the ambulance ride to the hospital. Although the DCI agents were dressed casually and did not threaten or coerce Ellenbecker during questioning, it is undisputed there was a significant police presence at the hospital—basically he was "under guard." For example, two officers, one of whom rode with Ellenbecker in the ambulance, were in the room when the DCI agents arrived. The ambulance-ride officer remained on the floor, although he was not in the room during the agents' questioning. But he returned to the room during both breaks the DCI agents took in their two-hour interrogation on that first night.

Also on the first night, the DCI agents took the initiative to contact medical staff and arrange for Ellenbecker to have medical staff *constantly present in his room* after they left the hospital at 1:35 a.m. The hospital complied and the medical staff person was in the room when different DCI agents returned in the morning to question him. Ellenbecker was arrested at 12:30 p.m., shortly after this questioning concluded.

While the DCI agents told Ellenbecker the arrangement with medical staff was to insure he would not harm himself, objectively such a *medical* decision is within hospital expertise. The initiation, specific direction, and arrangements for

staffing made by law enforcement leads to the conclusion Ellenbecker's custody continued uninterrupted during his hospitalization. At no point during his hospital stay was Ellenbecker left alone in his room. Clearly, law enforcement acted to "monitor" his hospital stay. *See Martin*, 781 F.2d at 673.

Based on these facts and circumstances and using an objective test, a reasonable person in Ellenbecker's position would have understood that he remained in police custody at the hospital, in spite of the agents' frequent and continued assurances he had not been arrested when handcuffed and was not under arrest or in custody at the hospital.[7] The October 20-21 hospital interrogations constituted custodial interrogations that needed to be preceded by *Miranda* warnings. No one fact is controlling but taken together, the facts compel this conclusion. Any statements made by Ellenbecker after he was taken into custody at the apartment complex are therefore inadmissible. We reverse and remand for further proceedings in accordance with this opinion.

**REVERSED AND REMANDED.**

---

[7] "The [agents] doth protest too much, methinks." William Shakespeare, *Hamlet* act 3, Sc.2, line 220 (one's excessive repetition of a statement to the point others suspect the opposite of what one says).